Stephanie R. Tatar, Esq. (SBN: 237792)
**TATAR LAW FIRM, APC**
3500 West Olive Ave., Suite 300
Burbank, CA 91505
Tel: (323) 744-1146
Fax: (888) 778-5695
E-mail: Stephanie@thetatarlawfirm.com

Paul B. Mengedoth, Esq. (*pro hac vice application to be submitted*)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail:  paul@mengedothlaw.com

[Additional Counsel Listed on Signature Page]

*Counsel for Plaintiff James Banneck
and all similarly situated individuals.*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES BANNECK, individually and on behalf of all others similarly situated, | ) ) ) ) **CASE NO.: 3:17-cv-4657** |
| Plaintiffs, | ) ) **CLASS ACTION COMPLAINT** |
| v. | ) ) **JURY TRIAL DEMANDED** |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, Defendant | ) ) ) ) |

### PRELIMINARY STATEMENT

1.      This is a consumer class action seeking injunctive relief, actual damages, statutory damages, and punitive damages based upon the Defendant's widespread violations of the California Consumer Credit Reporting Agencies Act ("CCRAA"), CAL. CIV. CODE §§ 1785.1 – 1787.3.

2.      Plaintiff, James Banneck, a mortgage applicant subjected to the repeated violation of, and intentional non-compliance with, the CCRAA brings this action on behalf of himself and other similarly-situated persons as defined below, to redress Defendant Federal National Mortgage Association's (hereinafter referred to as "Fannie Mae") past, present and continuing violations of the CCRAA, including but not limited to the provisions of CAL. CIV. CODE §§ 1785.10, 1785.15, 1785.14(b), and 1785.16.

3.      The obligations of consumer credit reporting agencies to follow reasonable procedures to assure "maximum possible accuracy" of reports they sell to third parties, for consumers to inspect information reported about themselves, and for consumer reporting agencies to correct inaccurate information they report about consumers once notified of a disputed inaccuracy is at the heart of the CCRAA.  Fannie Mae, however, deprives consumers of these rights by willfully and/or negligently failing to comply with the CCRAA by inaccurately reporting a consumer has undergone one or more prior foreclosures when, in fact, a consumer actually had a prior short sale, failing to provide consumers with all information it sells or furnishes on a cooperative non-profit basis about them to third parties, failing to permit consumers to obtain a copy of and review in information Fannie Mae sells about them, and failing to permit consumers to dispute and have corrected any inaccurate information Fannie Mae reports about them.

4.      As a well-known colossus in the secondary mortgage loan market, Fannie Mae also silently plays a dominant role in home mortgage loan origination.  While its involvement in the loan origination process is largely unknown to the public, Fannie Mae exerts a tremendous influence on each step of the application process.  Through its automated underwriting system that it requires lenders to use throughout the country, Fannie Mae obtains, reviews and evaluates consumer credit information in advance of loan origination for its own underwriting purposes; charges lenders, brokers and consumers

for this information through the generation and publication of consumer reports; and dictates to lenders and consumers the outcome of mortgage loan applications, including rates and terms.  This process enables Fannie Mae to reap significant profits by carrying out a business model based on risk-based pricing and the collection of fees for each loan application run through its system.

5.      However, despite its manifold roles as a user of credit information, a consumer credit reporting agency and a reseller of credit information in a typical mortgage transaction, Fannie Mae has deliberately made itself unaccountable to consumers, and intentionally fails to comply with any of the requirements imposed on it by the CCRAA.

6.      Fannie Mae's flagrant disregard for the law apparently results from an arrogant position that, as a government sponsored enterprise, it is somehow exempt from the grave responsibilities imposed by the CCRAA on every other company that uses, disseminates and/or sells consumer credit information.  As such, mortgage applicants like Plaintiff are harmed in that they are denied certain rights guaranteed by the CCRAA, including the ability to discover what information may have impacted their loan eligibility, the right to request and/or dispute the information that was considered in connection with their applications, and the right to expect that their credit information was reported with maximum possible accuracy.

## JURISDICTION AND VENUE

7.      Jurisdiction of this Court arises under 28 U.S.C. § 1332.

8.      This Court has personal jurisdiction over Fannie Mae because a substantial portion of the wrongdoing alleged in this Complaint took place in this state, Fannie Mae is authorized to business here, Fannie Mae has sufficient minimum contacts with this state, and/or Fannie Mae otherwise intentionally avails itself of markets in this state through the promotion, marketing and sale of its products and services in this state, to render exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

10.     Mr. Banneck is a natural person residing in the State of California, County of Contra Costa. Mr. Banneck is a "consumer" as defined by the CCRAA. CAL. CIV. CODE § 1785.3(b)

11.     Fannie Mae is a publicly held corporation that has a principal place of business located at 3900 Wisconsin Ave., NW Washington, DC 20016-2892, and which regularly conducts business throughout California and in all fifty (50) states in the United States.

12.     Fannie Mae operates as a "consumer credit reporting agency" ("CCRA") under the CCRAA. CAL. CIV. CODE § 1785.3(d)

**FACTUAL ALLEGATIONS**

**A.      Fannie Mae and Its Automated Desktop Underwriter System**

13.     Fannie Mae is a shareholder-owned for-profit corporation that is publicly traded on the U.S. Stock Exchange.

14.     Fannie Mae is also known as a government-sponsored enterprise ("GSE") because it was chartered by Congress to provide a secondary market for home mortgages. In exchange for its agreement to act as a mortgage loan purchaser in the secondary market, Fannie Mae's charter provides it with certain financial advantages and incentives.

15.     Due to federal banking regulations requiring most primary mortgage lenders to maintain minimum capital, after originating mortgage loans, many mortgage lenders in the United States sell their loans to Fannie Mae.

16.     Fannie Mae, together with its "little brother" Freddie Mac, purchase or guarantee more than half of all mortgages originated in the United States, depending upon market conditions and consumer trends.

17.   Fannie Mae purchases what are known as conventional conforming loans.  These are loans that are not insured or guaranteed by the federal government, are less than $417,000, and have certain prescribed risk characteristics.  Fannie Mae publishes its *Selling Guide* which outlines the specific requirements necessary for eligibility for Fannie Mae purchase.

18.   Fannie Mae buys these conventional conforming loans and either bundles them as securities and sells them to investors or holds the loans in its own portfolios.

19.   Unknown to the public, and due to its status as one of the two (2) dominant secondary market purchasers of mortgages, along with mortgage lenders' interest in assuring the sale of their loans, Fannie Mae has entered into contracts with numerous mortgage lenders and/or brokers throughout the United States which, in exchange for its advance commitment to buy mortgage loans from these lenders in the secondary market, allow it to dictate the underwriting terms and conditions of most of the conventional conforming loans that these lenders originate.

20.   For the mortgage lenders and brokers who have contracts with Fannie Mae and who sell mortgage loans to Fannie Mae in the secondary market, Fannie Mae requires that the mortgage applications be submitted through its *Desktop Underwriter* automated underwriting system ("DU System") in order to get a quick approval or denial, the best lender/broker pricing, higher debt-to-income ratios, higher loan-to-value ratios, better loan programs not available outside the DU System, and risk-based pricing, before any commitment is made to the prospective borrowers.  For these lenders, Fannie Mae leases or licenses its DU System for use by the lenders or mortgage loan brokers, and charges these lenders or brokers a fee or does so on a cooperative non-profit basis for each mortgage application run through the DU System.

21.     Fannie Mae's DU System is also used in connection with non-conforming loans that Fannie Mae is not permitted to purchase pursuant to its congressional charter.  These other types of loans include, but are not limited to FHA, Jumbo, and sub-prime loans.

22.     Through the DU System, Fannie Mae gathers data from an applicant's three-file and/or "tri-merge" consumer report from either a reseller of credit information or one or more of the three (3) major credit repositories, Equifax, Trans Union and Experian ("National Repositories), which Fannie Mae sells to the mortgage lender or broker.

23.     And while a mortgage broker or lender may order a credit report from a reseller/tri-merge company or National Repositories during the application process as required by the DU Guidelines, the DU System automatically uploads the raw credit data and other consumer credit information it gathers from the reseller/tri-merge company or National Repositories.

24.     Fannie Mae further mandates all resellers/tri-merge companies and/or National Repositories adhere to Fannie Mae's own confidential and proprietary guidelines for the methods of transmission, format and content of the raw credit data which is imported into its DU System.

25.     Fannie Mae's DU System then reviews, assesses and/or evaluates all of the information it obtains from the lender and/or broker derived from the borrower's loan application and the separate raw credit data uploaded from other consumer reporting agencies and/or resellers/tri-merge companies into the DU System, and generates its own report, known most frequently as the *Desktop Underwriting Findings* report ("DU Findings Report").

26.     The DU Findings Report is a detailed report documenting, among other things, the applicant's credit history, credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, mode of living, assets, income, debt-to-income ratio, and employment.  Further, the DU Findings Report contains findings, conclusions, comments and results

reached by Fannie Mae concerning the applicant's credit and his or her "eligibility" for loan purchase by Fannie Mae, as well as Fannie Mae's recommendation as to whether the lender should grant or originate the loan, deny the loan or approve it subject to certain conditions being satisfied. These DU Findings Report determinations are made for all types of loans submitted through the DU System, whether or not Fannie Mae purchases them in the secondary market.

27. Upon information and belief, Fannie Mae's contracts with its mortgage lender clients prohibit lenders and/or brokers from disclosing all or part of its DU Findings Reports, and Fannie Mae intentionally enforces a policy of restricting disclosure of the DU Findings Reports from the very consumers to whom they pertain.

28. If Fannie Mae determines that a consumer is ineligible for loan purchase, or may only be approved subject to a change in loan terms, a higher interest rate, the imposition of additional fees, charges, documentation or the satisfaction of certain underwriting conditions based on information contained in the consumer report it obtains, it does not provide the consumer with any notice of the adverse action it has taken, in violation of the CCRAA.

29. Further, despite the fact that it compiles, issues, maintains and sells or provides on a cooperative non-profit basis DU Findings Reports to lenders and/or brokers on a nationwide basis, Fannie Mae does not provide consumers with disclosures of the files it maintains on them, the sources of the information it reports, summaries of their rights, does not maintain any toll-free telephone numbers available to consumers, and does not investigate any consumer disputes, all also in further violation of the CCRAA.

**B.    Fannie Mae's Failure to Comply With The CCRAA Was Willful**

30. Fannie Mae has acknowledged in its own internal documents that Fannie Mae is subject to the restrictions and obligations set forth in the FCRA, which mirrors the same restrictions and obligations as the CCRAA, when acting as a user of consumer reports, yet Fannie Mae knowingly

and/or recklessly disregarded its additional separate obligation to maintain reasonable procedures under the CCRAA or FCRA to assure the maximum possible accuracy of foreclosure and short sale information in DU Finding Reports when it furnished them to lenders and/or brokers.

31.     At least by 2013, Fannie Mae's own internal documents acknowledge Fannie Mae read and understood that any one of seven FCRA statutory characteristics "trigger the FCRA" and went on to specify that such factors included "*any information* bearing on a 1) consumer's creditworthiness, 2) credit standing, 3) credit capacity, 4) character, 5) general reputation, 6) personal characteristics, or 7) mode of living." *See* 15 U.S.C. 1681a(d)(emphasis added).  These very same seven characteristics specifically referenced in the CCRAA for the definition of a "consumer credit report." *See* CAL. CIV. CODE § 1785.3(c)(1).

32.     In the operation of its Desktop Underwriter system, Fannie Mae evaluates and analyzes raw credit data and makes a recommendation in the form of Fannie Mae's DU Findings Report that is furnished to subscribing lenders and/or brokers.  Fannie Mae knows or has reason to know that its evaluation and analysis in the form of its recommendation conveyed through the DU Findings Report bears significantly on one or more of the foregoing seven factors.

33.     Fannie Mae knew or had reason to know that its conduct in the operation of its Desktop Underwriter System triggered the CCRAA obligation for it to maintain reasonable procedures designed to assure the maximum possible accuracy of the information it furnished to lenders and/or brokers. Nevertheless, Fannie Mae persisted in evaluating and analyzing raw credit data indicating the existence of a short sale and then falsely identifying that information as a "FORECLOSURE" in its DU Findings Reports - which Fannie Mae knew or should have known would significantly and adversely impact a consumer's eligibility to obtain mortgage financing.

34.     At least by 2013, Fannie Mae internally described and quoted the broad purpose of the FCRA set forth in the preamble to the companion federal statute.  It acknowledged the FCRA's purpose to be "*intended to ensure fair and accurate credit reporting*" in order to protect consumers "by requiring that *Consumer Reporting Agencies* ("CRAs") *adopt procedures to ensure* the confidentiality, *accuracy* and proper utilization of such information."  (Emphasis added).  Thus, Fannie Mae knew and/or had reason to know not only the national credit repositories (Equifax, Trans Union and Experian) had accuracy obligations under 15 U.S.C. § 1681e(b) of the FCRA, but a broader category of all consumer reporting agencies were covered under the FCRA and CCRAA and their dual mandate for accurate reporting.

35.     When Fannie Mae's chose to disregard the accuracy of the information they were reporting, electing instead to identify and specifically use the term "FORECLOSURE" when the raw credit data indicated a short sale, came under fire, Fannie Mae, with the encouragement from and assistance of FHFA, made a concerted effort to shift blame away from Fannie Mae and on to one of the national credit repositories, mortgage servicers, resellers of tri-merge reports, coding adopted by the national credit associations, and even the lenders and/or brokers for failing to manually underwrite loans Fannie Mae knew they could not and/or would not do.

36.     Prior to the acts alleged herein, Fannie Mae failed to read the CCRAA as potentially requiring an entity, such as itself, that evaluates raw credit data and provides a recommendation to be used in considering the consumer's eligibility for a mortgage, to follow reasonable procedures to assure the maximum possible accuracy of the information it reported in its DU Findings Reports to third-parties.  Fannie Mae failed to read, or chose to ignore a reading, of the FCRA or CCRAA statutory language that its conduct as described herein falls squarely within the definition of a "consumer credit reporting agency" and "consumer report."

37.     Fannie Mae's utter failure to read the FCRA or CCRAA statutory language, or its choice not to so read the statute, that the DU Findings Reports are "consumer reports" and that Fannie Mae's activity in furnishing false information in DU Findings Reports to third-parties triggered the CCRAA, was not reasonable.  If Fannie Mae ever made an express prior reading of the FCRA or CCRAA to reach any such conclusion, which Plaintiff does not allege Fannie Mae first ever did, its reading was directly contrary to the broad scope of the FCRA or CCRAA and the same range of harms for which Congress enacted the FCRA to protect against more than forty years ago.

38.     Congress enacted the FCRA "*to ensure fair and accurate credit reporting*, *promote efficiency in the banking system*, and protect consumer privacy." *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (emphasis added).  To that same end, the California legislature embodied in the language of the statute its finding that "[t]here is a need to insure that consumer credit reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." CAL. CIV. CODE §§ 1785.1(c).

39.     Congress enacted the FCRA in recognition of the large impact a credit report can have on a person's life by affecting his access to both employment and credit, the importance of which was highlighted by long-standing case law prior to Fannie Mae's conduct here.  *See, e.g.*, *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153-54 (9th Cir. 2009); *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 981-82 (7th Cir. 2004); *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir. 2001).

40.     Additionally, prior to the DU Findings Reports that Fannie Mae furnished here, a host of Federal Trade Commission Interpretations of the FCRA describing the broad application of the FCRA made it clear that those entities who procure and disseminate consumer reports to third parties – who do not even participate in the ultimate decision – are consumer reporting agencies subject to the FCRA. In

particular, an employment agency that obtains information on job applicants and furnishes it to a prospective employer is a consumer reporting agency. *See* FTC Commentary on the FCRA, 16 C.F.R. Pt. 600 app. Sec 603(f)(4). Similarly, an entity that compiles claim payment information on prospective insureds and furnishes it to insurance companies for use in underwriting decisions is a consumer reporting agency. *Id*. at 16 C.F.R. Pt. 600 app. Sec. 603(f)(5). And private investigators who regularly obtain consumer reports and furnish them to their clients may be consumer reporting agencies. *Id.* at 16 C.F.R. Pt. 600 app. Sec. 603(f)(6); *see also 40 Years of Experience With the Fair Credit Reporting Act – An FTC Staff Report With Summary of Interpretations* (July 2011) at pp. 28-32 (emphasizing the FCRA is intended to cover a very broad range of "assembling" or "evaluating" activities triggering that entities fall within the FCRA).

41.     Moreover, the FTC has repeatedly concluded that entities that provide consumer reports to clients or in response to a specific request are consumer reporting agencies. Specifically, the FTC has opined that an entity that provides employee screening services for client-employers (criminal history searches, Social Security number checks, education and employment verifications) is a consumer reporting agency. *See* FTC Informal Staff Opinion Letter: Haynes (June 9, 1998). Similarly, the FTC concluded that, if a bank uses an "intermediary" entity to pull credit reports from the credit repositories and merge them into a single streamlined consumer report it provides to the bank, the intermediary is a consumer reporting agency. *See* FTC Informal Staff Opinion Letter: Kane (Oct. 27, 1997).

42.     The FTC also concluded that an entity that performs a similar function for automobile lenders as Fannie Mae does for mortgage lenders is a consumer reporting agency. *See* FTC Informal Staff Opinion: Grimes (June 9, 1993). The entity, Lendernet, received loan application information from automobile dealers, whereupon it obtained the applicant's credit report. It would then scan potential lender requirements and provide the dealer with a list of lenders. At the same time, it would provide

application and credit information to lenders and provide them with a list of all dealer loan applications that meet Lendernet's criteria. The FTC opined that Lendernet was a consumer reporting agency as that term is broadly defined under the FCRA.

43.     Fannie Mae's utter disregard of the additional mandate of the CCRAA to assure the accuracy of information it furnished in its DU Findings Reports resulted in conduct that carried a substantially greater risk of harm than that associated with a merely careless interpretation of the CCRAA because Fannie Mae programed its DU System from the outset to have no ability to distinguish foreclosures from short sales - resulting in tens of thousands if not more rejections or refusals to process consumers' mortgage loan applications based on false information Fannie Mae furnished to lenders and/or brokers, effectively cutting out deserving consumers as participants in the mortgage marketplace as the struggling economy was trying to rebound.

44.     In 2012 and early 2013, Fannie Mae became increasingly aware from complaints from borrowers, mortgage lenders/brokers, consumer reporting agencies, resellers, consumer reporting trade industry associations, the Consumer Financial Protection Bureau, and members of Congress that its DU System needed to be reprogrammed to fix its false reporting of foreclosures instead of short sales. Fannie Mae, however, refused to do so.

C.     **The Downturn In The Economy Resulted In Many Homeowners Negotiating Short Sales Of Real Estate**

45.     Plaintiff Banneck, like all other class members herein, owned a piece of real estate that was subject to a mortgage lien.

46.     In 2007, the United States economy suffered a dramatic downturn.  The housing bubble burst, and there was a significant negative domino effect in the lending industry as well as the investment market.  Hordes of homeowners found themselves obligated on mortgages significantly greater than the values of their underlying homes.

47.     Short sales – a lender-approved sale of a home for less than the outstanding mortgage amount – emerged as a leading response to the growing crisis.

48.     By 2012, the Federal Housing Finance Agency ("FHFA") announced measures to make short sales easier for owners of underwater homes. The significant growth in approved short sales has helped buoy the housing market and push distressed house prices higher in the past few years.

49.     In February of 2010, Plaintiff Banneck, like all other class members herein, negotiated a short sale of his real estate satisfying both his first and second mortgage loans.

50.     Pursuant to Fannie Mae's published Desktop Underwriter Guidelines ("DU Guidelines"), Fannie Mae will not even consider purchasing a conventional mortgage loan if the applicant has had a short sale in the two (2) years prior to the current obligation.  In other words, Plaintiff Banneck, like all other class members herein, would not be able to qualify for conventional mortgage financing for a minimum of two (2) years following his short sale.

51.     Plaintiff Banneck, like all other class members herein, waited his obligatory two (2) years before applying for a new conventional mortgage loan.

52.     Specifically, in or around April and May of 2013, Plaintiff sought to obtain a mortgage loan for himself through Red Rock Mortgage ("Red Rock") to purchase residential property in Las Vegas, Nevada.

53.     Plaintiff Banneck was denied conventional mortgage financing.

54.     For Plaintiff Banneck, like every class member herein, the basis for each denial was a DU Findings Report that contained a "Refer with Caution" recommendation, which amounts to a credit denial.

55.     For Plaintiff Banneck, like every class member herein, each "Refer with Caution" recommendation resulted from the fact that Fannie Mae inaccurately identified the previous short-sale as

a "foreclosure," which automatically disqualifies the applicant for conventional mortgage financing for seven (7) years, rather than two (2).

56.     One or more of the DU Findings Reports Fannie Mae furnished to Red Rock pertaining to Plaintiff Banneck specifically stated as follows:

> Desktop Underwriter has identified a deed-in-lieu of foreclosure that was reported within the last two years, or a foreclosure that was reported within the last seven years.  This loan is ineligible for delivery to Fannie Mae.

| Borrower | Creditor | FC Type | Account Number | Date Report |
|----------|----------|---------|----------------|-------------|
| James Banneck | HSBC Bank | Foreclosure | ****1933 | 06/13 |

57.     Plaintiff Banneck, like all other class members herein, suffered economic and/or non-economic harm as a result of this denial of his mortgage application.

**D.     DU Wrongly Flags Short Sales (And Any Serious Mortgage Delinquency) As A Foreclosure**

58.     On March 12, 2013, Fannie Mae released a "Desktop Underwriter Clarification" in response to mounting "requests for clarification on how Desktop Underwriter (DU) identifies a foreclosure and a pre-foreclosure sale[.]"  *See* Desktop Underwriter Clarification (a copy of which is attached hereto as Exhibit 1).

59.     In this regard, Fannie Mae described DU's identification of a pre-foreclosure or short sale as follows:

**Preforeclosure Sale Identification**

A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved.  At this time, there are no codes provided in the credit report data received by DU that specifically identify a preforeclosure sale.

With DU Version 8.2 in December 2010, DU began issuing a message based on the presence of Remarks Codes E0047 (Settlement accepted on this account), T0140 (Settled for less than full balance), or R0107 (Account legally paid in full for less than the full balance) on a mortgage or HELOC account.  However, because those codes can be used on any account for any reason, DU is not able to use those codes to identify a preforeclosure sale with 100% accuracy, so it is not able to fully automate the preforeclosure sale waiting period or eligibility requirements.

When DU issues the preforeclosure sale message the lender must confirm that the preforeclosure sale had been completed two or more years from the credit report date, and must confirm that the loan casefile complies with all other requirements specific to preforeclosure sales as specified in the Fannie Mae *Selling Guide*.

*See* Exhibit 1 at 1 of 3.

60.     Per the DU Findings Reports used to deny Plaintiff Banneck's mortgage application, like all other class members herein, Fannie Mae specifically and correctly identified the previous short sale.

61.     So long as the pre-foreclosure or short sale was completed more than two (2) years before the current application, that prospective loan is still eligible for purchase by Fannie Mae and the DU System will automatically not refer, i.e., deny, the application.  *See* Selling Guide, Part B, Subpart 3, Chapter 5 (relevant excerpts of the 2011 and 2013 versions of which are attached collectively hereto as Exhibit 2) at 433-434 and 464-465, respectively.  *See also* Exhibit 1 at page 2 of 7.

62.     In describing a DU Finding's Report identification of a foreclosure in the DU System, Fannie Mae represents as follows:

**Foreclosure Identification**

When reviewing the credit report data received, DU reviews the manner of payment (MOP) codes and Remarks Codes associated with each tradeline, and the Public Record information to determine if a foreclosure has occurred.

Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as subject to a foreclosure if there is a current status code or MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline.  If a foreclosure was reported within the seven-year period prior to the report date associated with the tradeline, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae as a DU loan.

*See* Exhibit 1 at 1 of 3.

63.     Per this "Desktop Underwriter Clarification," Fannie Mae admits that accounts reported by the original creditor merely as "collection or charge-off" – accounts admittedly not in foreclosure – will be identified by the DU System as having been in foreclosure.

64.     Any prospective loan that DU identifies as having a foreclosure in the previous seven (7) years will automatically be ineligible for purchase by Fannie Mae.  See Exhibit 2 at 464.

65.     Thus, for Plaintiff Banneck, like all other class members herein, even though a DU Findings Report correctly identified a previous short sale, acknowledging that so long as that short sale was more than two (2) years ago, the same DU Findings Report also manufactured a non-existent foreclosure and referred, i.e., denied, the application accordingly.

66.     This incorrect identification of a foreclosure prevented Plaintiff Banneck, like all other class members herein, from obtaining his conventional mortgage financing at the terms originally negotiated.

**E.**     **Fannie Mae Acknowledges Deficiencies In The DU System And DU Finding Reports**

67.     Upon information and belief, Plaintiff Banneck is only one of hundreds of thousands (if not greater numbers) of homeowners who have had a short sale misidentified by a DU Findings Report as a foreclosure, thereby preventing them from obtaining conventional financing or refinancing.

68.     In May 2013, the Consumer Protection Subcommittee of the U.S. Senate Committee on Commerce, Science & Transportation held a hearing on Capitol Hill to address a variety of problems plaguing the consumer reporting industry.

69.     During this hearing, Senator Bill Nelson, D-Fla., raised serious concerns about the significant and growing numbers of his constituents that had been denied conventional financing due DU Finding Reports wrongly identifying a foreclosure, in addition to, or instead of, a short sale.

70.     Legal counsel and staff for Senator Nelson informed Fannie Mae and FHFA in May of 2013 they believed Fannie Mae's falsely identifying an actual short sale as a foreclosure was a violation of the FCRA.

71.     After months of prodding from Senator Nelson, the federal Consumer Financial Protection Bureau, the National Consumer Reporting Association and the National Association of Realtors, Fannie Mae announced a change to its automated DU System to "fix" the problem:

***Underwriting when Conflicting or Inaccurate Foreclosure Information Provided on DIL or PFS Tradeline***
Fannie Mae has been made aware that there are often inconsistencies in the credit data when DIL and PFS events occur, and in an effort to assist borrowers in obtaining a new loan in an appropriate timeframe, DU will be updated to disregard the foreclosure information on the credit report when instructed to do so by the lender on the online loan application.

When DU identifies a foreclosure on a credit report tradeline that appears to be one that was subject to a DIL or PFS, the lender may instruct DU to disregard the foreclosure information on the credit report by entering "Confirmed CR DIL" or "Confirmed CR PFS" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU.  When DU sees this indication, the foreclosure information on the credit report tradeline that also has a DIL or PFS Remarks Code will not be used.

*See* Desktop Originator/Desktop Underwriter Release Notes DU Version 9.1 dated August 20, 2013 (relevant excerpts of which are attached collectively hereto as Exhibit 3) at 6.

72.     While these changes were expected to take effect the week of November 16, 2013, see Exhibit 3 at 1, and were intended to allow consumers to rightfully obtain conventional financing from that point going forward, consumers continued to either be denied or would foregoing seeking to apply for credit to obtain residential mortgage financing through Fannie Mae's automated DU System because DU Findings Reports continued to inaccurately identify short sales as foreclosures.

73.     Because Fannie Mae had no mechanism to permit disclosure of DU Findings Reports or for consumers to dispute inaccurate information appearing on them, Plaintiff Banneck, like other member of the class, was left no other alternative but to dispute with one of the National Repositories and/or a reseller, rather than Fannie Mae, he did not have a foreclosure but instead had a short sale more than two years earlier.

74.     Plaintiff Banneck, like all other class members herein, suffered substantial economic and non-economic harm as a result of the false DU Findings Reports Fannie Mae issued through its DU System.

**CLASS ACTION ALLEGATIONS**

75.     Plaintiff brings this action on behalf of the following Classes:

(a)     For Fannie Mae's violation of section 1785.10 and 1785.15 of the CCRAA:

All persons residing in the State of California who, during the period beginning seven (7) years prior to the filing of this Complaint and continuing through the date of the resolution of this case, requested their consumer file from Fannie Mae at a time that Fannie Mae had reported to a third party information on a DU Findings Report. Excluded from the class definition are any employees, officers, directors of Fannie Mae, any attorney appearing in this case, any consumer who has signed and delivered to Fannie Mae a general release of claims and any judge assigned to hear this action.

(b)     For Fannie Mae's violation of section 1785.14(b) of the CCRAA:

All natural persons residing in the State of California who, within seven (7) years prior to the filing of this Complaint, were the subjects of a DU Findings Report furnished to a third party wherein Fannie Mae reported such person as having a prior short sale or pre-foreclosure sale and obtained a "Refer with Caution" recommendation because Fannie Mae identified such person as having a foreclosure within the last seven (7) years. Excluded from the class definition are any employees, officers, directors of Fannie Mae, any attorney appearing in this case, any consumer who has signed and delivered to Fannie Mae a general release of claims and any judge assigned to hear this action.

(c)     For Fannie Mae's violations of section 1785.16 of the CCRAA:

All persons residing in the State of California who, during the period beginning seven (7) years prior to the filing of this Complaint and continuing through the date of the resolution of this case, Fannie Mae furnished a DU Findings Report to any third party which included any inaccurate information.  Excluded from the class definition are any employees, officers, directors of Fannie Mae, any attorney appearing in this case, any consumer who has signed and delivered to Fannie Mae a general release of claims and any judge assigned to hear this action.

76.     The Classes are so numerous that joinder of all members is impracticable.  Although the precise number of Class members is known only to Defendants, Plaintiff avers upon information and belief that the Classes number in the thousands.

77.    There are questions of law and fact common to the Classes that predominate over any questions affecting only individual Class members.  The principal questions concern whether the Fannie Mae willfully and/or negligently violated the CCRAA by failing to provide consumers with access to all information contained in their consumer files, by failing to follow reasonable procedures to assure the maximum possible accuracy of the information contained in consumers' files with respect to foreclosures and short sales and by failing to include all information concerning short sales and foreclosures Fannie Mae had reported about them, including the specific source of the foreclosure and short sale information being reported and the dates that the information was initially reported or publicized.

78.    Plaintiff's claims are typical of the claims of the Classes, which all arise from the same operative facts and are based on the same legal theories.

79.    Plaintiff will fairly and adequately protect the interests of the Classes.  Plaintiff is committed to vigorously litigating this matter.  Further, Plaintiff has secured counsel who are very experienced in handling consumer class actions.  Neither Plaintiff nor his counsel has any interests which might cause them not to vigorously pursue this claim.

80.    This action should be maintained as a class action because the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing the Classes, as well as a risk of adjudications with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

81.    Fannie Mae has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the CCRAA Classes.

82.    Whether Fannie Mae violated the CCRAA can be easily determined by Fannie Mae's policies and a ministerial inspection of Fannie Mae's business records.

83.     A class action is a superior method for the fair and efficient adjudication of this controversy.  Management of the Classes' claims is likely to present significantly fewer difficulties than those presented in many individual claims.  The identities of the Class members may be derived from Fannie Mae's records.

**CLAIMS**
**COUNT I – VIOLATION OF THE CCRAA §§ 1785.10, 1785.15 (Individual and Class)**

84.     Plaintiff incorporates all paragraphs as though the same were set forth at length herein.

85.     The above-mentioned DU Findings Report was a "consumer credit report" as that term is defined by CAL. CIV. CODE § 1785.3(c).

86.     Pursuant to CAL. CIV. CODE § 1785.31, Fannie Mae is liable for violating the CCRAA by failing to provide California consumers, upon request, with a copy of their disclosure containing all information on that consumer in violation of CAL. CIV. CODE §§ 1785.10 and 1785.15 with respect to Plaintiff and the Class.

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class; that judgment be entered for Plaintiff and the Class against Fannie Mae for damages of $100 to $5,000 per Class member per violation under the CCRAA; that the Court award injunctive relief under the CCRAA as follows: Fannie Mae shall cease to sell or furnish on a cooperative non-profit basis DU Findings Reports to third parties unless and/or until (A) it implements a procedure to allow a consumer to obtain a free file disclosure once annually through a streamlined and convenient process and (B) allow consumers to obtain all information in their files, including the sources of the information and all inquiries within the past twelve (12) months immediately preceding the request; that the Court award costs and reasonable attorney's fees under the CCRAA; and such other and further relief as may be necessary, just and proper.

1

2    **COUNT II – VIOLATION OF THE CCRAA § 1785.14(b)(Individual and Class)**

3       87.    Plaintiff incorporates all paragraphs as though the same were set forth at length herein.

4       88.    Pursuant to CAL. CIV. CODE § 1785.31, Fannie Mae is liable for violating the CCRAA

5    by failing to follow reasonable procedures to assure "maximum possible accuracy" of the reports it

6    sold, in violation of CAL. CIV. CODE § 1785.14(b) with respect to Plaintiff and the Class by selling or

7    furnishing on a cooperative non-profit basis the inaccurate identification of a prior short sale as a

8    foreclosure.

9       WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed Class

10   under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to

11   represent the Class; that judgment be entered for Plaintiff and the Class against Fannie Mae for damages

12   of $100 to $5,000 per Class member per violation under the CCRAA; that judgment be entered for

13   Plaintiff and the Class against Fannie Mae for actual damages under the CCRAA; that judgment be

14   entered for Plaintiff and the Class against Fannie Mae for actual damages under the CCRAA; that the

15   Court award injunctive relief under the CCRAA as follows: Fannie Mae shall cease to sell or furnish on

16   a cooperative non-profit basis DU Findings Reports to third parties unless and/or until implementation

17   of reasonable procedures to assure the maximum possible accuracy of DU Findings Reports; that the

18   Court award costs and reasonable attorney's fees under the CCRAA; and such other and further relief as

19   may be necessary, just and proper.

20

21       **COUNT III – VIOLATION OF THE CCRAA § 1785.16 (Individual and Class)**

22       89.    Plaintiff incorporates the foregoing paragraphs as though the same were set forth at

23   length herein.

24       90.    Pursuant to CAL. CIV. CODE § 1785.16, with respect to Plaintiff and the Class, Fannie

25   Mae is liable for violating the CCRAA by failing, when the completeness or accuracy of any item of

26   information contained in a consumer's file is disputed by a consumer, and the dispute is conveyed

27   directly to the consumer credit reporting agency by the consumer or user on behalf of the consumer,

28

within a reasonable period of time and without charge, reinvestigate and record the current status of the disputed information before the end of the 30-business-day period beginning on the date Fannie Mae receives notice of the dispute from the consumer or user .

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class; that judgment be entered for Plaintiff and the Class against Fannie Mae for damages of $100 to $5,000 per Class member per violation under the CCRAA; that judgment be entered for Plaintiff and the Class against Fannie Mae for actual damages under the CCRAA; that judgment be entered for Plaintiff and the Class against Fannie Mae for actual damages under the CCRAA; that the Court award injunctive relief under the CCRAA as follows: Fannie Mae shall cease to sell or furnish on a cooperative non-profit basis DU Findings Reports to third parties unless and/or until implementation of a procedure to allow consumers to dispute any information in their file and a reinvestigating of such dispute pursuant to CAL. CIV. CODE § 1785.16; that the Court award costs and reasonable attorney's fees under the CCRAA; and such other and further relief as may be necessary, just and proper.

## JURY TRIAL DEMAND

91.    Plaintiff demands trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, the Class, and/or the general public, prays for judgment against Fannie Mae as follows:

a) An order certifying this action as a Plaintiff class action under Rule 23 of the Federal Rules of Civil Procedure as set forth herein;

b) For a temporary, preliminary and permanent order for injunctive relief enjoining Fannie Mae from to selling or furnishing on a cooperative non-profit basis any DU Findings Reports regarding any consumer located in the State of California until such time as Fannie Mae adopts

and implements practices and procedures for complying with CCRAA practices complained of above;

c) For a temporary, preliminary and permanent order for injunctive relief requiring Fannie Mae to undertake an immediate public information campaign to inform members of the general public as to their prior practices and notifying the members of the proposed Class of the potential for restitutionary relief;

d) For an order requiring disgorgement and restitution of Fannie Mae's ill-gotten gains and to pay restitution to Plaintiff, the Class, and the general public all funds acquired by means of any practice declared by this Court to be unlawful, deceptive or unfair;

e) For compensatory, special and general damages according to proof and as the Court deems just and proper;

f) Assuming certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, for distribution of any moneys recovered on behalf of the general public, or the Class, via fluid recovery or *cy pres* recovery where necessary to prevent Fannie Mae from retaining any of the profits or benefits of their wrongful conduct;

g) For punitive and exemplary damages; and as to counts for which they are available under the applicable law in such amount as the Court deems just and proper;

h) For double and/or treble damages and/or penalties; and as to counts for which they are available under the applicable law in such amount as the Court deems just and proper;

i) Imposition of a constructive trust, an Order granting recessionary and injunctive relief and/or such other equitable relief, including restitution, disgorgement of ill-gotten profits and an order requiring Fannie Mae to provide corrective notice to Class Members as set forth herein and as the Court deems just and proper;

j) An appropriate claims resolution facility to administer the relief in this case;

j) For reasonable attorneys' fees and costs of investigation and litigation under, among the statutes set forth herein, or the common fund doctrine;

k) For costs of lawsuit, pre-judgment, and post-judgment interest; and

l) Such other and further relief as the Court may deem necessary or appropriate.

Dated:  August 11, 2017

/s/      Stephanie R. Tatar
Stephanie R. Tatar, Esq. (SBN: 237792)
**TATAR LAW FIRM, APC**
3500 West Olive Ave., Suite 300
Burbank, CA 91505
Tel: (323) 744-1146
Fax: (888) 778-5695
E-mail: Stephanie@thetatarlawfirm.com

Paul B. Mengedoth, Esq. (*Pro Hac Vice to be submitted*)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail: paul@mengedothlaw.com

Sylvia A. Goldsmith, Esq. (*Pro Hac Vice to be submitted*)
**GOLDSMITH & ASSOCIATES, LLC**
20545 Center Ridge Road, Suite 120
Rocky River, OH 44116
Tel: (440) 934-3025
E-mail:  goldsmith@goldsmithlawyers.com

James A. Francis, Esq. (*Pro Hac Vice to be submitted*)
John Soumilas, Esq. (*Pro Hac Vice to be submitted*)
**FRANCIS & MAILMAN, P.C.**
Land Title Building, Suite 1902
100 South Broad Street
Philadelphia, PA 19110
Tel: (215) 735-8600
E-mail: jfrancis@consumerlawfirm.com
E-mail: jsoumilas@consumerlawfirm.com

Kristi Cahoon Kelly, Esq. *(Pro Hac Vice to be submitted)*
Andrew Guzzo, Esq. *(Pro Hac Vice to be submitted)*
**KELLY & CRANDALL PLC**
3925 Chain Bridge Road, Suite. 202
Fairfax, VA 22030
Tel: (703) 424-7570
E-mail: kkelly@kellyandcrandall.com
E-mail: aguzzo@kellyandcrandall.com

***Attorneys for Plaintiff***

**EXHIBIT 1**



# Desktop Underwriter Clarification
*The DU identification of a previous foreclosure or preforeclosure sale*

March 12, 2013

Recent requests for clarification on how Desktop Underwriter® (DU®) identifies a foreclosure and a preforeclosure sale have been received. This document is being provided to clarify the DU identification of these significant derogatory events.

## Foreclosure Identification

When reviewing the credit report data received, DU reviews the manner of payment (MOP) codes and Remarks Codes associated with each tradeline, and the Public Record information to determine if a foreclosure has occurred.

Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as subject to a foreclosure if there is a current status code or MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline. If a foreclosure was reported within the seven-year period prior to the report date associated with the tradeline, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae as a DU loan.

> **NOTE:** *On loan casefiles where DU determined a mortgage or HELOC account was subject to a prior foreclosure, if the account was actually reported in error, or the foreclosure was the result of extenuating circumstances, lenders have the option to manually underwrite those loans (assuming the appropriate waiting period has been met) in accordance with the Fannie Mae Selling Guide.*

## Preforeclosure Sale Identification

A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved. At this time, there are no codes provided in the credit report data received by DU that specifically identify a preforeclosure sale.

With DU Version 8.2 in December 2010, DU began issuing a message based on the presence of Remarks Codes E0047 (Settlement accepted on this account), T0140 (Settled for less than full balance), or R0107 (Account legally paid in full for less than the full balance) on a mortgage or HELOC account. However, because those codes can be used on any account for any reason, DU is not able to use those codes to identify a preforeclosure sale with 100% accuracy, so it is not able to fully automate the preforeclosure sale waiting period or eligibility requirements.

When DU issues the preforeclosure sale message the lender must confirm that the preforeclosure sale had been completed two or more years from the credit report date, and must confirm that the loan casefile complies with all other requirements specific to preforeclosure sales as specified in the Fannie Mae *Selling Guide*.

> **NOTE:** *On loan casefiles that receive a Refer with Caution recommendation because DU determined a mortgage or HELOC account was subject to a foreclosure (based on a current status or MOP code of "8 or 9", as stated in the Foreclosure Identification section above), if the account was actually subject to a preforeclosure sale, lenders have the option to manually underwrite those loans (assuming the appropriate waiting period has been met) in accordance with the Fannie Mae Selling Guide.*

## Lender Responsibility

For all mortgage loans, the lender is responsible for reviewing the credit report, as well as all credit information, to determine that the credit report meets Fannie Mae's requirements and that the data evaluated by DU was accurate.

If a foreclosure or preforeclosure sale was not clearly identified in the credit report, the lender must obtain copies of appropriate documentation for the event and ensure that the appropriate waiting periods and eligibility guidelines have been met. The documentation must establish the completion date of a previous foreclosure or preforeclosure sale.

Additional information is available in Appendix A of this document, as well as the Fannie Mae Selling Guide.

## For More Information

For more information about these topics, lenders may contact their Fannie Mae customer account team; and mortgage brokers should contact their DO sponsoring wholesale lender.

© 2013 Fannie Mae. Trademarks of Fannie Mae.

# Appendix A: Fannie Mae Selling Guide Sections

The following section of the Selling Guide further describes how DU determines a foreclosure, provides information on the message issued on a preforeclosure sale, and is the official policy statement of Fannie Mae.

## B3-5.3-09, DU Credit Report Analysis

DU applies the following guidelines to prior foreclosures:

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as a foreclosure if there is a current status or manner of payment/MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline.
- If a foreclosure was reported within the seven-year period prior to the credit report date, the loan casefile will receive a Refer with Caution or Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.
- If the filed date and the satisfied date of the foreclosure are both unknown, but it appears that the foreclosure occurred within the seven-year period prior to the credit report date, the lender must confirm that the foreclosure did not occur within the most recent seven-year period.
- Foreclosure laws vary by state and the time it takes to complete the process may vary by state. DU assumes that the date the foreclosure was reported in the tradeline is the date of the foreclosure sale or liquidation. The lender must confirm that all foreclosures are satisfied.

## Preforeclosure Sales or Short Sales

DU is not able to identify preforeclosure or short sales in the credit report data. Lenders must manually apply the preforeclosure sale requirements to DU loan casefiles, regardless of the underwriting recommendation received from DU.

DU will issue a message on loan casefiles where the borrower's credit report indicates an account may have been released to a preforeclosure sale. The recommendation on the loan casefile will not be changed when this information appears on the credit report, though as stated above, the lender must ensure the loan complies with all other requirements specific to preforeclosure sales as specified in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (05/15/2012).

**Note**: B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (05/15/2012), also contains additional requirements pertaining to underwriting borrowers with a preforeclosure sale, short sale, or extenuating circumstances. DU is not able to identify preforeclosure or short sales in the credit report data, or whether the borrower's derogatory credit history was the result of extenuating circumstances. Loan casefiles that receive a Refer with Caution or Refer with Caution/IV recommendation due to a bankruptcy or foreclosure action that was caused by extenuating circumstances may be manually underwritten if the lender has the appropriate documentation that these events occurred, the applicable minimum time period has elapsed, and the loan meets all requirements of this *Selling Guide* that pertain to manually underwritten loans.

**EXHIBIT 2**

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

January 27, 2011

# B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (06/30/2010)

## Introduction

This topic contains information on the waiting periods for significant derogatory credit events, including:

- General Information

- Bankruptcy (Chapter 7 or Chapter 11)

- Bankruptcy (Chapter 13)

- Multiple Bankruptcy Filings

- Foreclosure

- Deed-in-Lieu of Foreclosure and Preforeclosure Sale

- Summary — All Waiting Period Requirements

- Requirements for Re-establishing Credit

## General Information

The presence of significant derogatory credit events dramatically increase the likelihood of a future default and represents a significantly higher level of default risk. Examples of significant derogatory credit events include bankruptcies, foreclosures, deeds-in-lieu of foreclosure, preforeclosure sales, and short sales.

> **Note:** The terms "preforeclosure sale" and "short sale" are used interchangeably in this Guide and have the same meaning (see Deed-in-Lieu of Foreclosure and Preforeclosure Sale below).

The lender must determine the cause and significance of the derogatory information, verify that sufficient time has elapsed since the date of the last derogatory information, and confirm that

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

January 27, 2011

the borrower has re-established an acceptable credit history. The lender must make the final decision about the acceptability of a borrower's credit history when significant derogatory credit information exists.

If not clearly identified in the credit report, the lender must obtain copies of appropriate documentation for the significant derogatory credit event. The documentation must establish the completion date of a previous foreclosure, deed-in-lieu or preforeclosure sale; confirm the bankruptcy discharge or dismissal date; and identify debts that were not satisfied by the bankruptcy. Debts that were not satisfied by a bankruptcy must be paid off or have an acceptable, established repayment schedule.

This topic describes the amount of time that must elapse (the "waiting period") after a significant derogatory credit event before the borrower is eligible for a new loan salable to Fannie Mae. The waiting period commences on the completion, discharge or dismissal date (as applicable) of the derogatory credit event and ends on the application date of the new loan. See B3-5.3-08, Extenuating Circumstances for Derogatory Credit for additional information.

---

## Bankruptcy (Chapter 7 or Chapter 11)

A four-year waiting period is required, measured from the discharge or dismissal date of the bankruptcy action.

### Exceptions for Extenuating Circumstances

A two-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the discharge or dismissal date of the bankruptcy action.

---

## Bankruptcy (Chapter 13)

A distinction is made between Chapter 13 bankruptcies that were discharged and those that were dismissed. The waiting period required for Chapter 13 bankruptcy actions is measured as follows:

- two years from the discharge date, or

- four years from the dismissal date.

The shorter waiting period based on the discharge date recognizes that borrowers have already met a portion of the waiting period within the time needed for the successful completion of a Chapter 13 plan and subsequent discharge.

A borrower who was unable to complete the Chapter 13 plan and received a dismissal will be held to a four-year waiting period.

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted after a Chapter 13 dismissal, if extenuating circumstances can be documented. There are no exceptions permitted to the two-year waiting period after a Chapter 13 discharge.

---

### Multiple Bankruptcy Filings

For a borrower with more than one bankruptcy filing within the past seven years, a five-year waiting period is required, measured from the most recent dismissal or discharge date.

> **Note:** The presence of multiple bankruptcies in the borrower's credit history is evidence of significant derogatory credit and increases the likelihood of future default. Two or more borrowers with individual bankruptcies are not cumulative, and do not constitute multiple bankruptcies. For example, if the borrower has one bankruptcy and the co-borrower has one bankruptcy this is not considered a multiple bankruptcy.

*Exceptions for Extenuating Circumstances*

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the most recent bankruptcy discharge or dismissal date. The most recent bankruptcy filing must have been the result of extenuating circumstances.

---

### Foreclosure

A seven-year waiting period is required, and is measured from the completion date of the foreclosure action as reported on the credit report or other foreclosure documents provided by the borrower.

*Exceptions for Extenuating Circumstances*

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the completion date of the foreclosure action. Additional requirements apply between three and seven years, which include:

• Maximum LTV ratios of the lesser of 90% or the maximum LTV ratios for the transaction per the Eligibility Matrix.

- The purchase of a principal residence is permitted.

- Limited cash-out refinances are permitted for all occupancy types pursuant to the eligibility requirements in effect at that time.

   **Note:** The purchase of second homes or investment properties and cash-out refinances (any occupancy type) are not permitted until a seven-year waiting period has elapsed.

### Deed-in-Lieu of Foreclosure and Preforeclosure Sale

These transaction types are completed as alternatives to foreclosure. A deed-in-lieu of foreclosure is a transaction in which the deed to the real property is transferred back to the servicer. A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved by the servicer.

The following waiting period requirements apply:

| Waiting Period | Additional Requirements |
|---|---|
| Two years | 80% maximum LTV ratios[a] |
| Four years | 90% maximum LTV ratios[a] |
| Seven years | LTV ratios per the Eligibility Matrix |

[a]The maximum LTV ratios permitted are the lesser of the LTV ratios in this table or the maximum LTV ratios for the transaction per the Eligibility Matrix.

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted if extenuating circumstances can be documented, with maximum LTV ratios of the lesser of 90% or the maximum LTV ratios for the transaction per the Eligibility Matrix.

### Summary — All Waiting Period Requirements

The following table summarizes the waiting period requirements for all significant derogatory credit events.

| Derogatory Event | Waiting Period Requirements | Waiting Period with Extenuating Circumstances |
|---|---|---|

| Bankruptcy — Chapter 7 or 11 | 4 years | 2 years |
|---|---|---|
| Bankruptcy — Chapter 13 | • 2 years from discharge date<br><br>• 4 years from dismissal date | • 2 years from discharge date<br><br>• 2 years from dismissal date |
| Multiple Bankruptcy Filings | 5 years if more than one filing within the past 7 years | 3 years from the most recent discharge or dismissal date |
| Foreclosure | 7 years | 3 years<br><br>Additional requirements after 3 years up to 7 years:<br><br>• 90% maximum LTV ratios[a]<br><br>• Purchase, principal residence<br><br>• Limited cash-out refinance, all occupancy types |
| Deed-in-Lieu of Foreclosure and Preforeclosure Sale | • 2 years — 80% maximum LTV ratios[a]<br><br>• 4 years — 90% maximum LTV ratios[a]<br><br>• 7 years — LTV ratios per the Eligibility Matrix | 2 years — 90% maximum LTV ratios[a] |

[a]The maximum LTV ratios permitted are the lesser of the LTV ratios in this table or the maximum LTV ratios for the transaction per the Eligibility Matrix.

## Requirements for Re-establishing Credit

After a bankruptcy, foreclosure, deed-in-lieu of foreclosure, or preforeclosure sale, the borrower's credit will be considered re-established if all of the following are met:

• The waiting period and the related additional requirements are met.

• The loan receives a recommendation from DU that is acceptable for delivery to Fannie Mae or, if manually underwritten, meets the minimum credit score requirements based on the parameters of the loan and the established eligibility requirements.

• The borrower has traditional credit as outlined in Section B3-5.3, Traditional Credit History. Nontraditional credit or "thin files" are not acceptable.

Printed copies may not be the most current version. For the most current version, go to the online version at http://www.efanniemae.com/sf/guides/ssg/.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

January 27, 2011

**Related Announcements**

The table below provides references to the Announcements that have been issued that are related to this topic.

| Announcements | Issue Date |
|---|---|
| Announcement SEL–2010–09 | June 30, 2010 |
| Announcement SEL–2010–08 | June 23, 2010 |
| Announcement SEL–2010–06 | April 30, 2010 |
| Announcement SEL–2010–05 | April 14, 2010 |

# B3-5.3-08, Extenuating Circumstances for Derogatory Credit (04/01/2009)

**Introduction**

This topic provides information on extenuating circumstances for derogatory credit information.

**Extenuating Circumstances**

Extenuating circumstances are nonrecurring events that are beyond the borrower's control that result in a sudden, significant, and prolonged reduction in income or a catastrophic increase in financial obligations.

If a borrower claims that derogatory information is the result of extenuating circumstances, the lender must substantiate the borrower's claim. Examples of documentation that can be used to support extenuating circumstances include documents that confirm the event (such as a copy of a divorce decree, medical reports or bills, notice of job layoff, job severance papers, etc.) and documents that illustrate factors that contributed to the borrower's inability to resolve the problems that resulted from the event (such as a copy of insurance papers or claim settlements, property listing agreements, lease agreements, tax returns (covering the periods prior to, during, and after a loss of employment), etc.).

The lender must obtain a letter from the borrower explaining the relevance of the documentation. The letter must support the claims of extenuating circumstances, confirm the nature of the event that led to the bankruptcy or foreclosure-related action, and illustrate the borrower had no reasonable options other than to default on their financial obligations.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

January 17, 2013

# B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (05/15/2012)

## Introduction

This topic contains information on the waiting periods for significant derogatory credit events, including:

- General Information
- Bankruptcy (Chapter 7 or Chapter 11)
- Bankruptcy (Chapter 13)
- Multiple Bankruptcy Filings
- Foreclosure
- Deed-in-Lieu of Foreclosure and Preforeclosure Sale
- Summary — All Waiting Period Requirements
- Requirements for Re-establishing Credit

## General Information

The presence of significant derogatory credit events dramatically increase the likelihood of a future default and represents a significantly higher level of default risk. Examples of significant derogatory credit events include bankruptcies, foreclosures, deeds-in-lieu of foreclosure, preforeclosure sales, and short sales.

> **Note:** The terms "preforeclosure sale" and "short sale" are used interchangeably in this Guide and have the same meaning (see Deed-in-Lieu of Foreclosure and Preforeclosure Sale below).

The lender must determine the cause and significance of the derogatory information, verify that sufficient time has elapsed since the date of the last derogatory information, and confirm that the borrower has re-established an acceptable credit history. The lender must make the final decision about the acceptability of a borrower's credit history when significant derogatory credit information exists.

If not clearly identified in the credit report, the lender must obtain copies of appropriate documentation for the significant derogatory credit event. The documentation must establish the completion date of a previous foreclosure, deed-in-lieu or preforeclosure sale; confirm the bankruptcy discharge or dismissal date; and identify debts that were not satisfied by the bankruptcy. Debts that were not satisfied by a bankruptcy must be paid off or have an acceptable, established repayment schedule.

This topic describes the amount of time that must elapse (the "waiting period") after a significant derogatory credit event before the borrower is eligible for a new loan salable to Fannie Mae. The waiting period commences on the completion, discharge or dismissal date (as applicable) of the derogatory credit event and ends on the application date of the new loan. See B3-5.3-08, Extenuating Circumstances for Derogatory Credit for additional information.

> **Note:** The requirements in this topic are not applicable to Refi Plus mortgage loans, but are applicable for DU Refi Plus loans (see B5-5.2-02, DU Refi Plus and Refi Plus Underwriting Considerations).

## Bankruptcy (Chapter 7 or Chapter 11)

A four-year waiting period is required, measured from the discharge or dismissal date of the bankruptcy action.

### Exceptions for Extenuating Circumstances

A two-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the discharge or dismissal date of the bankruptcy action.

## Bankruptcy (Chapter 13)

A distinction is made between Chapter 13 bankruptcies that were discharged and those that were dismissed. The waiting period required for Chapter 13 bankruptcy actions is measured as follows:

- two years from the discharge date, or
- four years from the dismissal date.

The shorter waiting period based on the discharge date recognizes that borrowers have already met a portion of the waiting period within the time needed for the successful completion of a Chapter 13 plan and subsequent discharge.

A borrower who was unable to complete the Chapter 13 plan and received a dismissal will be held to a four-year waiting period.

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted after a Chapter 13 dismissal, if extenuating circumstances can be documented. There are no exceptions permitted to the two-year waiting period after a Chapter 13 discharge.

## Multiple Bankruptcy Filings

For a borrower with more than one bankruptcy filing within the past seven years, a five-year waiting period is required, measured from the most recent dismissal or discharge date.

> **Note:** The presence of multiple bankruptcies in the borrower's credit history is evidence of significant derogatory credit and increases the likelihood of future default. Two or more borrowers with individual bankruptcies are not cumulative, and do not constitute multiple bankruptcies. For example, if the borrower has one bankruptcy and the co-borrower has one bankruptcy this is not considered a multiple bankruptcy.

*Exceptions for Extenuating Circumstances*

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the most recent bankruptcy discharge or dismissal date. The most recent bankruptcy filing must have been the result of extenuating circumstances.

## Foreclosure

A seven-year waiting period is required, and is measured from the completion date of the foreclosure action as reported on the credit report or other foreclosure documents provided by the borrower.

*Exceptions for Extenuating Circumstances*

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the completion date of the foreclosure action. Additional requirements apply between three and seven years, which include:

- Maximum LTV, CLTV, or HCLTV ratios of the lesser of 90% or the maximum LTV, CLTV, or HCLTV ratios for the transaction per the *Eligibility Matrix*.

- The purchase of a principal residence is permitted.

- Limited cash-out refinances are permitted for all occupancy types pursuant to the eligibility requirements in effect at that time.

January 17, 2013

**Note:** The purchase of second homes or investment properties and cash-out refinances (any occupancy type) are not permitted until a seven-year waiting period has elapsed.

---

**Deed-in-Lieu of Foreclosure and Preforeclosure Sale**

These transaction types are completed as alternatives to foreclosure. A deed-in-lieu of foreclosure is a transaction in which the deed to the real property is transferred back to the servicer. A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved by the servicer.

The following waiting period requirements apply:

| Waiting Period | Additional Requirements |
|---|---|
| Two years | 80% maximum LTV ratios[a] |
| Four years | 90% maximum LTV ratios[a] |
| Seven years | LTV ratios per the *Eligibility Matrix* |

[a]The maximum LTV ratios permitted are the lesser of the LTV ratios in this table or the maximum LTV ratios for the transaction per the *Eligibility Matrix*.

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted if extenuating circumstances can be documented, with maximum LTV ratios of the lesser of 90% or the maximum LTV ratios for the transaction per the *Eligibility Matrix*.

**Note:** References to LTV ratios include LTV, CLTV and HCLTV ratios.

---

**Summary — All Waiting Period Requirements**

The following table summarizes the waiting period requirements for all significant derogatory credit events:

| Derogatory Event | Waiting Period Requirements | Waiting Period with Extenuating Circumstances |
|---|---|---|
| Bankruptcy — Chapter 7 or 11 | 4 years | 2 years |
| Bankruptcy — Chapter 13 | • 2 years from discharge date | • 2 years from discharge date |

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

January 17, 2013

|  |  |  |
|---|---|---|
|  | • 4 years from dismissal date | • 2 years from dismissal date |
| Multiple Bankruptcy Filings | 5 years if more than one filing within the past 7 years | 3 years from the most recent discharge or dismissal date |
| Foreclosure | 7 years | 3 years<br><br>Additional requirements after 3 years up to 7 years:<br><br>• 90% maximum LTV ratios[a]<br><br>• Purchase, principal residence<br><br>• Limited cash-out refinance, all occupancy types |
| Deed-in-Lieu of Foreclosure and Preforeclosure Sale | • 2 years — 80% maximum LTV ratios[a]<br><br>• 4 years — 90% maximum LTV ratios[a]<br><br>• 7 years — LTV ratios per the *Eligibility Matrix* | 2 years — 90% maximum LTV ratios[a] |

[a]The maximum LTV ratios permitted are the lesser of the LTV ratios in this table or the maximum LTV ratios for the transaction per the *Eligibility Matrix*.

**Note:** References to LTV ratios include LTV, CLTV, and HCLTV ratios.

---

**Requirements for Re-establishing Credit**

After a bankruptcy, foreclosure, deed-in-lieu of foreclosure, or preforeclosure sale, the borrower's credit will be considered re-established if all of the following are met:

• The waiting period and the related additional requirements are met.

• The loan receives a recommendation from DU that is acceptable for delivery to Fannie Mae or, if manually underwritten, meets the minimum credit score requirements based on the parameters of the loan and the established eligibility requirements.

• The borrower has traditional credit as outlined in Section B3-5.3, Traditional Credit History. Nontraditional credit or "thin files" are not acceptable.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

January 17, 2013

## Related Announcements

The table below provides references to the Announcements that have been issued that are related to this topic.

| Announcements | Issue Date |
|---|---|
| Announcement SEL-2012–04 | May 15, 2012 |
| Announcement SEL-2011–13 | December 20, 2011 |
| Announcement SEL-2011–12 | November 15, 2011 |
| Announcement SEL-2011–04 | May 24.2011 |
| Announcement SEL-2010–09 | June 30, 2010 |
| Announcement SEL-2010–08 | June 23, 2010 |
| Announcement SEL–2010–06 | April 30, 2010 |
| Announcement SEL–2010–05 | April 14, 2010 |

# B3-5.3-08, Extenuating Circumstances for Derogatory Credit (04/01/2009)

## Introduction

This topic provides information on extenuating circumstances for derogatory credit information.

## Extenuating Circumstances

Extenuating circumstances are nonrecurring events that are beyond the borrower's control that result in a sudden, significant, and prolonged reduction in income or a catastrophic increase in financial obligations.

If a borrower claims that derogatory information is the result of extenuating circumstances, the lender must substantiate the borrower's claim. Examples of documentation that can be used to support extenuating circumstances include documents that confirm the event (such as a copy of a divorce decree, medical reports or bills, notice of job layoff, job severance papers, etc.) and documents that illustrate factors that contributed to the borrower's inability to resolve the problems that resulted from the event (such as a copy of insurance papers or claim settlements, property listing agreements, lease agreements, tax returns (covering the periods prior to, during, and after a loss of employment), etc.).

**EXHIBIT 3**


FannieMae

# Desktop Originator/Desktop Underwriter Release Notes
# DU Version 9.1

August 20, 2013
*Updated August 22, 2013*
*Updated September 10, 2013*

During the **weekend of November 16, 2013**, Fannie Mae will implement Desktop Underwriter® (DU®) Version 9.1, which will include the changes described below.

The changes included in this release will apply to new loan casefiles submitted to DU on or after the weekend of November 16, 2013. Loan casefiles created in DU Version 9.0 and resubmitted after the weekend of November 16 will continue to be underwritten through DU Version 9.0.

*September 10, 2013:  The following changes are being made to these Release Notes:*
The *Maximum Allowable Debt-to-Income Ratio* and *Minimum Credit Score Requirements* sections below have been combined.  DU will not apply additional requirements of a maximum debt-to-income ratio (DTI) of 45%, or a minimum representative credit score of 620 to DU Refi Plus loan casefiles that will have an increased principal and interest payment.  However, DU will issue a new message on all DU Refi Plus loan casefiles stating that the lender must determine if the loan casefile is a higher-priced mortgage loan (HPML) under Regulation Z, and if so, must manually apply the maximum DTI and minimum representative credit score requirements.   Refer to page 4 of these Release Notes for additional information.

The *LTV/CLTV/HCLTV Ratio Cap Lowered to 95%* section below has been updated to include information on the timeframes in which mortgage loans exceeding the maximum LTV/CLTV/HCLTV ratio of 95% must be delivered to Fannie Mae.  Refer to page 5 of these Release Notes for additional information.

An additional Remarks Code used to identify a previous deed-in-lieu of foreclosure has been added to the *Identifying a Deed-in-Lieu of Foreclosure or Preforeclosure Sale* section.  Refer to page 5 of these Release Notes for additional information.

*August 22, 2013:  The following change is being made to these Release Notes:*
Two new sections have been added below regarding enhancements to the foreclosure, deed-in-lieu of foreclosure, and preforeclosure sale messages that are issued by DU.  Refer to pages 5, 6, 7, and 8 of these Release Notes for additional information.

## Ability to Repay and Qualified Mortgages

*Selling Guide* Announcement SEL-2013-06 specified policy changes made to comply with the "ability to repay" provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act. The rule generally requires lenders to make a reasonable, good faith determination of a consumer's ability to repay before originating a mortgage loan and establishes certain protections from liability for "qualified mortgages." The ability to repay rule will take effect for applications dated on or after January 10, 2014, and the following updates will be made with DU Version 9.1 in support of these changes.

© 2013 Fannie Mae. Trademarks of Fannie Mae.

As a reminder, DU will not evaluate a loan's compliance with federal and state laws and regulations or whether it meets certain legal standards. DU will not consider a loan's potential status as a qualified mortgage. Lenders bear sole responsibility for that determination and for compliance with applicable requirements.

> Note:   In order to help lenders prepare for compliance with the rule, these changes will apply to all DU Version 9.1 loan casefiles created on or after the weekend of November 16, 2013, ahead of the January 10, 2014 application date.

### Retirement of the Interest-only Feature and 40-year Terms

With DU Version 9.1, loan casefiles with a repayment type of interest-only, loan casefiles underwritten using an interest-only ARM plan, loan casefiles underwritten using with amortization terms greater than 360 months, and loan casefiles underwritten using a 40-year ARM will receive an Out of Scope recommendation from DU.

### Updated Qualifying Rate Requirements

DU Version 9.1 will qualify all 7/1 and 10/1 Fannie Mae ARMs at the greater of the fully indexed rate or note rate.  DU will use the following interest rates to determine the proposed PITI used when qualifying the borrower:

| Mortgage Type | Qualifying Interest Rate |
|---|---|
| Fixed-Rate Mortgages | Note Rate |
| 6-Month to 5-Year ARMs[1] | Greater of the fully indexed rate or the note rate + 2.0% |
| 7- to 10-Year ARMs[1] | Greater of the fully indexed rate or the note rate |
| Lender ARM Plans | |
| Lender ARM Plans | Interest rate entered in the *ARM Qualifying Rate* field. If an interest rate is not entered, DU uses the note rate + 2.0%. |

[1] The fully indexed rate is defined here as the index plus the margin as entered in the online loan application.  The index and margin are required for all Fannie Mae ARM loans submitted to DU.

### Requirement for Index and Margin

In order for the fully indexed rate to be determined, the index and margin must be entered into DU.  If the index and margin are not included in the loan casefile submission to DU, the loan casefile will receive an Ineligible recommendation, and a message will be issued letting the user know that they should enter the correct index and margin data and resubmit the loan casefile to DU.

## DU Refi Plus Enhancements

The DU Refi Plus™ enhancements below will be made with DU Version 9.1.

### Retirement of Estimated Value Message

The Consumer Financial Protection Bureau (CFPB) issued a rule under ECOA to require creditors to provide mortgage applicants with free copies of all appraisals and any other written valuations that were developed in connection with a loan application.  The requirement takes effect in January 2014.

© 2013 Fannie Mae. Trademarks of Fannie Mae.

In preparation of the new regulation, the message issued on DU Refi Plus loan casefiles that specifies the estimated value of the property used by DU to determine eligibility for the DU Refi Plus property fieldwork waiver will no longer be issued on DU Version 9.1 loan casefiles.  This change will decrease the number of property valuations that lenders are required to provide to their borrowers under the new regulation, and will help minimize borrower confusion by reducing the possibility of multiple and sometimes inconsistent values being reported to the borrower on the same property.

> Note:   The retirement of the message specifying the estimated value for the property will in no way impact the number of loan casefiles that are eligible for the DU Refi Plus property fieldwork waiver.

### Retirement of Expanded Approval Recommendations

With DU Version 9.1, the retirement of Expanded Approval (EA) recommendations will be completed and EA recommendations will no longer be returned.  DU Version 9.1 loan casefiles will only receive Approve/Eligible, Approve/Ineligible, Refer with Caution, Out of Scope, and Error recommendations.

> Note:   Since EA-I, EA-II, and EA-III recommendation levels will no longer be returned for DU Refi Plus loan casefiles, the number of DU Refi Plus loan casefiles that receive an Approve recommendation will be expanded.

DU will no longer issue the standard Approve/Eligible messages stating the risk profile of this loan casefile appears to meet Fannie Mae's guidelines and that the loan casefile appears to meet Fannie Mae eligibility requirements on DU Refi Plus loan casefiles.  DU will issue a new message on Approve/Eligible DU Refi Plus loan casefiles stating, "*This loan casefile appears to meet the expanded risk assessment and eligibility guidelines offered on DU Refi Plus loan casefiles.*"

### Updates to the DU Underwriting Findings Report

The DU Underwriting Findings report and the Underwriting Analysis Report will be updated with DU Version 9.1 for DU Refi Plus loan casefiles.  The sections that specify the Recommendation will be updated to make it clear that the recommendation received was based on the expanded eligibility offered on DU Refi Plus.

## SUMMARY

| | | | |
|---|---|---|---|
| DU Refi Plus Recommendation | Approve/Eligible | | |
| Primary Borrower | John  Homeowner | Co-Borrower | Mary  Homeowner |
| Lender Loan Number | My Loan Number | Casefile ID | 1234567890 |
| Submission Date | 12/03/2013 01:54PM | Submitted By | User ID |
| First Submission Date | 11/19/2013 12:34PM | DU Version | 9.1 |
| Submission Number | 6 | | |

...

## Underwriting Analysis Report

| | | | |
|---|---|---|---|
| DU Refi Plus Recommendation | Approve/Eligible | | |
| Primary Borrower | John  Homeowner | Co-Borrower | Mary  Homeowner |
| Lender Loan Number | My Loan Number | Casefile ID | 1234567890 |
| Submission Date | 12/03/2013 01:54PM | Submitted By | User ID |

...

**The DU Refi Plus recommendation for this case is: Approve/Eligible**

███████████████████████████████████████████████████████████████

*Maximum Allowable Debt-to-Income Ratio and Minimum Credit Score Requirements*
*Updated September 10, 2013:  The two topics have been combined and the DU enhancement has been updated.*

Because DU does not have the ability to determine if a loan casefile is a higher-priced mortgage loan (HPML) under Regulation Z, DU will issue a message on all DU Refi Plus loan casefiles stating that the lender must determine if the DU Refi Plus loan casefile is an HPML.  If the lender does determine that the loan casefile is an HPML, the lender must then manually confirm that the loan casefile has a representative credit score of 620 or more and a debt-to-income ratio of 45% or less in order for the loan to be eligible for delivery to Fannie Mae.

### Significant Derogatory Credit

To align with manual Refi Plus guidelines, the standard waiting period and re-establishment of credit criteria following a bankruptcy, foreclosure, deed-in-lieu of foreclosure, or preforeclosure sale is being removed for DU Refi Plus loan casefiles.  DU will issue a message on loan casefiles for borrowers with a previous bankruptcy, foreclosure, deed-in-lieu of foreclosure, or preforeclosure sale letting the lender know that DU did identify the event and that the loan casefile would be eligible for delivery to Fannie Mae, regardless of when the event occurred.

DU will also not require the lender to investigate judgments, bankruptcies, foreclosures, or lawsuits declared by the borrower in the Declarations section of the loan application on DU Refi Plus loan casefiles.

### Updated Non-Employment Income and Asset Messages

The non-employment income messages and asset messages will be updated to match the requirements specified in *Selling Guide* Announcement SEL-2012-09.  Lenders will no longer need to use the Job Aid for Compliance with DU Income and Assets Documentation Requirements for DU Refi Plus Loan Casefiles for DU Version 9.1 loan casefiles.

### Enhanced Address Matching

DU uses the "standardized" property address to establish a match with an existing loan to determine if the loan casefile is eligible to be refinanced using DU Refi Plus.  With DU Version 9.1, DU will use the standardized property address to match to the DU Refi Plus database, but if a match is not found, DU will then use the property address as entered on the online loan application.

### Enhanced Social Security Number Matching

Currently DU requires an eight digit Social Security Number (SSN) match in order to underwrite a loan casefile as DU Refi Plus.  With DU Version 9.1, the SSN matching will be updated to require only a seven digit SSN match.  When the SSN match does occur by only seven or eight digits (instead of nine), DU will issue a message requiring the lender to ensure the borrower(s) on the loan casefile is the borrower(s) on the current loan.

### Updated Leasehold Requirements

To align with manual Refi Plus guidelines, DU Refi Plus mortgage loans securitized by leasehold properties will no longer need to verify that the terms of the leasehold estate comply with the requirements of the *Selling Guide*.  Lenders will need to confirm that the term of the leasehold estate runs for at least five years beyond the maturity date of the mortgage, unless fee simple title will vest at an earlier date.

## LTV/CLTV/HCLTV Ratio Cap Lowered to 95%

DU Version 9.1 will reflect lower maximum LTV/CLTV/HCLTV ratios for standard and MyCommunityMortgage® (MCM®) fixed-rate transactions secured by a 1-unit primary residence. Those transactions will be subject to a maximum LTV/CLTV/HCLTV ratio of 95% (instead of 97%).   DU will continue to allow CLTV ratios of 105% when the subordinate financing is a Community Seconds® mortgage.

> *Note:   HFA loans submitted to DU are subject to separate LTV/CLTV ratios.  For specific HFA guidelines, lenders should contact their state Housing Finance Agency (HFA), and mortgage brokers should contact their DO sponsoring wholesale lender.  As a reminder, lenders must have approval to deliver HFA loans to Fannie Mae.*

### Delivery Considerations
**Added September 10, 2013:** *The following information is new to these Release Notes.*

Fannie Mae is implementing a flow delivery cut-off for mortgage loans exceeding the maximum LTV/CLTV/HCLTV ratio of 95%.

- All whole loans must be committed in eCommitting™ or eCommitONE® on or before June 30, 2014, and purchased by Fannie Mae on or before July 31, 2014.
- All loans in MBS must have issue dates on or before July 1, 2014.

After this time, Fannie Mae will consider deliveries of loans exceeding the maximum LTV/CLTV/HCLTV on a negotiated basis only.


## Deed-in-Lieu of Foreclosure and Preforeclosure Sale Message Updates
**Added August 22, 2013:** *The following information is new to these Release Notes.*

The DU treatment of loan casefiles for borrowers with a previous deed-in-lieu of foreclosure or preforeclosure sale, as reflected in the credit report data, is being updated with DU Version 9.1.

### Identifying a Deed-in-Lieu of Foreclosure or Preforeclosure Sale
**Updated September 10, 2013:** *An additional Remarks Code used to identify a previous deed-in-lieu of foreclosure has been added.*

When reviewing the credit report data, DU will consider a mortgage or home equity line of credit (HELOC) as one that was subject to a prior deed-in-lieu of foreclosure (DIL) when there is a Remarks Code associated with the credit report tradeline of T0060, T0061, T0213, or E0085; and will consider a mortgage or HELOC as one that was subject to a prior preforeclosure sale (PFS) when there is a Remarks Code associated with the credit report tradeline of E0047, T0140, or R0107.

For DIL and PFS tradelines, there is not a date on the credit report specifically related to each Remarks Code. Because of this incomplete credit data reporting structure, DU will not be able to determine when the DIL or PFS occurred.

When DU identifies a DIL or PFS using a Remarks Code, a message will be issued stating that a DIL or PFS was identified and that the lender must confirm the accuracy of the information.  The message will also require that the lender document that the event was completed two or more years from the credit report date, and the loan casefile must comply with all other requirements specific to a DIL or a PFS, as specified in the *Selling Guide*.

In the event that a foreclosure is also identified on the tradeline based on one of the following:

- a current manner of payment (MOP) of "8,"
- a maximum delinquency MOP of "8,"
- a MOP in the MOP history grid of "8," or
- a Remarks Code that indicates a foreclosure;

then that foreclosure information will be used by DU and the account will be considered a foreclosure.

### Underwriting when Conflicting or Inaccurate Foreclosure Information Provided on DIL or PFS Tradeline

Fannie Mae has been made aware that there are often inconsistencies in the credit data when DIL and PFS events occur, and in an effort to assist borrowers in obtaining a new loan in an appropriate timeframe, DU will be updated to disregard the foreclosure information on the credit report when instructed to do so by the lender on the online loan application.

When DU identifies a foreclosure on a credit report tradeline that appears to be one that was subject to a DIL or PFS, the lender may instruct DU to disregard the foreclosure information on the credit report by entering "Confirmed CR DIL" or "Confirmed CR PFS" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU.  When DU sees this indication, the foreclosure information on the credit report tradeline that also has a DIL or PFS Remarks Code will not be used.

DU will issue a message stating that the foreclosure information included on the account was not used in the eligibility assessment because DU was instructed by the user to underwrite the loan casefile without the reported foreclosure information.  The lender must then document that the account was subject to a DIL or PFS, that the event was completed two or more years from the credit report date, and the loan casefile complies with all other requirements specific to a DIL or PFS, as specified in the *Selling Guide*.

> Note:   When more than one item needs to be entered in the Explanation field, the items must be separated by a comma.  For example, when the borrower has conflicting foreclosure and DIL information on one tradeline and conflicting foreclosure and PFS information on another, the lender may instruct DU to disregard the foreclosure information on those tradelines by entering "Confirmed CR DIL, Confirmed CR PFS."

The following is a screen shot of the Desktop Originator® (DO®)/DU User Interface that shows question c., the Explanation field, and examples of how the data should be entered on the online loan application:

| | Borrower 1 | Borrower 2 |
|---|---|---|
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | Yes | No |

|   | Borrower 1 | Borrower 2 |
|---|---|---|
| a. | | |
| b. | | |
| c. | Confirmed CR DIL, Confirmed CR PFS | |

For questions regarding the support of this field by a lender's loan origination system, lenders should contact their technical support team, and may also contact their Fannie Mae Account Team for additional assistance.

## New Messages for Foreclosure, Deed-in-Lieu of Foreclosure and Preforeclosure Sale

***Added August 22, 2013:*** *The following information is new to these Release Notes.*

New messages will be added with DU Version 9.1 that are based on information Fannie Mae has on loans that have been liquidated due to a foreclosure, a DIL, or a PFS. When a foreclosure, DIL, or a PFS is identified in the Fannie Mae data, DU will use that information in its eligibility assessment.

If the Fannie Mae data shows a foreclosure occurred in the seven years prior to the submission date, or a DIL or PFS occurred in the two years prior to the submission date, the loan casefile will receive a Refer with Caution recommendation.

> *Note:   The database that includes the information Fannie Mae has on loans that have been liquidated due to a foreclosure, a DIL, or a PFS will be updated each month. Because new loan information will be added each month, lenders may see these new messages appear on resubmissions of DU Version 9.1 loan casefiles.*

### Underwriting when Inaccurate Information Included in Fannie Mae Data

When the Fannie Mae data includes information associated with the foreclosure, DIL, or a PFS that the lender confirms is inaccurate, the lender may instruct DU to disregard the information by entering "Confirmed FM FC Incorrect", "Confirmed FM DIL Incorrect", or "Confirmed FM PFS Incorrect" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When DU sees this indication, the information associated with the event will not be used.

DU will issue a message stating that information was not used in the eligibility assessment because DU was instructed by the user to underwrite the loan casefile without the information. The lender must then document that the foreclosure was completed seven or more years from the submission date; or that the DIL or PFS was completed two or more years from the credit report date, and the loan casefile complies with all other requirements specific to a DIL or PFS, as specified in the *Selling Guide.*

> *Note:   When more than one item needs to be entered in the Explanation field, the items must be separated by a comma. For example, when the borrower has conflicting foreclosure and PFS information on a credit report tradeline, and inaccurate PFS information in the Fannie Mae data, the lender may instruct DU to disregard the foreclosure information on the tradeline and the information in the Fannie Mae data by entering "Confirmed CR PFS, Confirmed FM PFS Incorrect."*

The following is a screen shot of the DO/DU User Interface that shows question c., the Explanation field, and examples of how the data should be entered on the online loan application:

| | Borrower 1 | Borrower 2 |
|---|---|---|
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | No ▾ | No ▾ |

| | Borrower 1 | Borrower 2 |
|---|---|---|
| a. | | |
| b. | | |
| c. | Confirmed CR PFS, Confirmed FM PFS Incorrect | |

For questions regarding the support of this field by a lender's loan origination system, lenders should contact their technical support team, and may also contact their Fannie Mae Account Team for additional assistance.

*Deed-in-lieu of Foreclosure and Preforeclosure Sale Guidelines*

DU Version 9.1 will also include the following guidelines that will apply to loan casefiles for borrowers where the Fannie Mae data indicates there was a prior DIL or PFS that occurred two or more years, but within 7 years from the submission date.

- Loan casefiles submitted to DU with an LTV or CLTV greater than 80 percent where a borrower on the loan casefile has a DIL or PFS that was two or more years, but within four years from the submission date will receive a message requiring the lender to confirm the information regarding the event. If the event was two or more years from the submission date but within the last four years, the loan would be ineligible for sale to Fannie Mae since the LTV/CLTV exceeds the maximum allowable LTV/CLTV of 80% for borrowers that have had a DIL or PFS that was completed two or more years ago, but within the last four years.

- Loan casefiles submitted to DU with an LTV or CLTV greater than 90 percent where a borrower on the loan casefile has a DIL or PFS that was completed four or more years, but within seven years from the submission date will receive a message requiring the lender to confirm the information regarding the event. If the event was four or more years from the submission date but within the last seven years, the loan would be ineligible for sale to Fannie Mae since the LTV/CLTV exceeds the maximum allowable LTV/CLTV of 90% for borrowers that have had a DIL or PFS that was completed four or more years ago, but within the last seven years.

## 2013 Area Median Income Limits

During the weekend of November 16, 2013, DU will be updated to reflect the 2013 Area Median Incomes (AMIs). The 2013 AMIs will be used to determine eligibility for MyCommunityMortgage loan casefiles submitted to DU Version 9.1 or resubmitted to DU Version 9.0 on or after the weekend of November 16, 2013.

The DO/DU user interface will also be updated during the weekend of November 16, 2013 to reflect the 2013 AMIs and changes to the MSA and non-MSA counties, as applicable.

## Retirement of DU Version 8.3

With the release of DU Version 9.1, DU Version 8.3, which went into production the weekend of August 20, 2011, will be retired. Therefore, effective the weekend of November 16, 2013, customers will no longer be able to resubmit loan casefiles to DU Version 8.3; however, customers will continue to be able to view online loan applications and DU Underwriting Findings reports that were created under DU Version 8.3. To obtain an updated underwriting recommendation after the weekend of November 16, customers must create a new loan casefile and submit it to DU.

## Updates to Align with the *Selling Guide*

### Updates to Employment and Income Messages

DU Version 9.1 will be updated to reflect clarifications and updates specified in *Selling Guide* Announcement SEL-2013-04. DU employment and income messages will be updated to reflect borrower signature requirements on tax returns, and the specific documentation requirements for Social Security benefits.

### Updated Asset Documentation Requirements

The asset documentation requirements will be updated with DU Version 9.1. Lenders will be required to obtain bank statements covering a two-month period to document depository accounts on standard loan casefiles, and will be required to obtain bank statements covering a one-month period to document depository accounts on DU Refi Plus loan casefiles.

© 2013 Fannie Mae. Trademarks of Fannie Mae.

*Age of Credit Document Message Changes*

*Selling Guide* Announcement SEL-2013-04 also changed the maximum age of income, asset, and credit documents policy such that credit documents can be no more than four months old on the date the note is signed for all mortgage loans (existing and new construction). The messages that remind lenders of this policy will be updated to reflect this change.

*Miscellaneous Message Text Changes*

Various DU messages will be updated with DU Version 9.1 in order to provide clarity and consistency with the *Selling Guide*.

*DO/DU User Interface Updates*

The DO/DU User Interface will be updated the weekend of November 16, 2013 to remove all links pointing to the retired efanniemae.com.  These links will now point to the business portal on fanniemae.com.

*Updates to the Selling Guide and Eligibility Matrix*

The *Selling Guide* will be updated to reflect the changes in this release in a future guide update. The Desktop Underwriter Maximum Allowable LTV Ratios chart in the Eligibility Matrix will also be updated to reflect the changes to the LTV ratios, as well as the retirement of the interest-only feature.

## For More Information

For more information about these Release Notes, lenders may contact their Fannie Mae customer account team; and mortgage brokers should contact their DO sponsoring wholesale lender.

© 2013 Fannie Mae. Trademarks of Fannie Mae.