Stephanie R. Tatar, Esq. (SBN: 237792)
TATAR LAW FIRM, APC
3500 West Olive Ave., Suite 300
Burbank, CA 91505
Tel: (323) 744-1146
Fax: (888) 778-5695
E-mail: Stephanie@thetatarlawfirm.com

Paul B. Mengedoth, Esq. (*pro hac vice*)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail:  paul@mengedothlaw.com

[Additional counsel listed on signature page]

*Counsel for Plaintiff James Banneck
and all similarly situated individuals.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES BANNECK,<br>individually and on behalf of all others<br>similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION<br><br>        Defendant. | **Case No. 3:17-04657-WHO**<br><br>**AMENDED CLASS ACTION<br>COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## PRELIMINARY STATEMENT

1.    This is a consumer class action seeking injunctive relief, actual damages, and statutory damages based upon the Defendant's widespread violations of the California Consumer Credit Reporting Agencies Act ("CCRAA"), CAL. CIV. CODE §§ 1785.1 – 1787.3 and the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x.

2.     Plaintiff, James Banneck, a mortgage applicant subjected to the repeated violation of, and intentional non-compliance with, the CCRAA and FCRA brings this action on behalf of himself and other similarly-situated persons as defined below, to redress Defendant's past, present and continuing violations of CCRAA sections 1785.14(b) and 1785.14(c), and FCRA section 1681e(c).

3.     The obligations of consumer credit reporting agencies to follow reasonable procedures to assure "maximum possible accuracy" of reports they sell to third parties, and for consumers to have access to information reported about themselves are at the heart of the CCRAA and FCRA.  Fannie Mae, however, deprives consumers of these rights by willfully and negligently failing to comply with the CCRAA and FCRA by inaccurately reporting on its Desktop Underwriter Findings Reports ("DU Findings Reports") that a consumer has undergone one or more prior foreclosures when, in fact, a consumer actually had a prior short sale, and prohibiting mortgage originators from providing consumers with a copy of the information Fannie Mae sells about them.

4.     Fannie Mae compounds this problem, and propagates general widespread inaccuracy in its DU Findings Reports, by willfully concealing its DU Findings Reports from consumers, actively preventing them from obtaining copies of DU Findings Reports, even when mortgage lenders or brokers take adverse actions based upon the reports.   Through its standardized contracts, Fannie Mae prohibits mortgage lenders and or brokers from disclosing the contents DU Findings Reports to consumers, in violation of two independent sections of the CCRAA and a provision of the FCRA as well.  *See*  CAL. CIV. CODE § 1785.14(c) and CAL. CIV. CODE § 1785.10.1; 15 U.S.C.  §1681e(c).

5.     As a well-known colossus in the secondary mortgage loan market, Fannie Mae also silently plays a dominant role in home mortgage loan origination.  While its involvement in the loan origination process is largely unknown to the public, Fannie Mae exerts a tremendous influence on each step of the application process.  Through its automated underwriting system that it requires lenders to use throughout the country, Fannie Mae obtains, reviews and evaluates consumer credit information in advance of loan origination for its own underwriting purposes;

charges lenders, brokers and consumers for this information through the generation and publication of consumer reports; and dictates to lenders and consumers the outcome of mortgage loan applications, including rates and terms. This process enables Fannie Mae to reap significant profits by carrying out a business model based on risk-based pricing and the collection of fees for each loan application run through its system.

6.     However, despite its manifold roles as a user of credit information, a consumer credit reporting agency and a reseller of credit information in a typical mortgage transaction, Fannie Mae has deliberately made itself unaccountable to consumers, and intentionally fails to comply with the requirements imposed on it by the CCRAA and FCRA.

7.     Fannie Mae's flagrant disregard for the law apparently results from an unfounded position that, as a government sponsored enterprise, it is somehow exempt from the grave responsibilities imposed by the CCRAA and FCRA on every other company that uses, disseminates and/or sells consumer credit information. As such, mortgage applicants like Plaintiff are harmed in that they are denied certain rights guaranteed by the CCRAA and FCRA, including the ability to discover the information Fannie Mae is reporting about them which may have impacted their loan eligibility, and the right to expect that their credit information was reported with maximum possible accuracy.

## JURISDICTION AND VENUE

8.     Jurisdiction of this Court arises under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p with respect to the FCRA claim pled herein, and under 28 U.S.C. § 1332.

9.     This Court has personal jurisdiction over Fannie Mae because a substantial portion of the wrongdoing alleged in this Complaint took place in this state, Fannie Mae is authorized to business here, Fannie Mae has sufficient minimum contacts with this state, and/or Fannie Mae otherwise intentionally avails itself of markets in this state through the promotion, marketing and sale of its products and services in this state, to render exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

AMENDED CLASS ACTION COMPLAINT

## PARTIES

11.    Mr. Banneck is a natural person residing in the State of California, County of Contra Costa.  Mr. Banneck is a "consumer" as defined by the CCRAA  (CAL. CIV. CODE § 1785.3(b)) and the FCRA (15 U.S.C. § 1681a(c)).

12.    Fannie Mae is a publicly held corporation that has a principal place of business located at  3900 Wisconsin Ave., NW Washington, DC 20016-2892, and which regularly conducts business throughout California and in all fifty (50) states in the United States.

13.    Defendant operates as a "consumer credit reporting agency" ("CCRA") under the CCRAA (CAL. CIV. CODE § 1785.3(d)), and as a "consumer reporting agency" ("CRA") under the FCRA (15 U.S.C. § 1681a(f)).

## FACTUAL ALLEGATIONS

### A.    Fannie Mae and Its Automated Desktop Underwriter System

14.    Fannie Mae is a shareholder-owned for-profit corporation that is publicly traded on the U.S. Stock Exchange.

15.    Fannie Mae is also known as a  government-sponsored enterprise  ("GSE") because  it was chartered  by Congress to provide a secondary market for home mortgages.  In exchange for its agreement to act as a mortgage loan purchaser in the secondary market, Fannie Mae's charter provides it with certain financial advantages and incentives.

16.    Due to federal banking regulations requiring most primary mortgage lenders to maintain minimum capital, after originating mortgage loans, many mortgage lenders in the United States sell their loans to Fannie Mae.

17.    Fannie Mae, together with its "little brother" Freddie Mac, purchases or guarantees more than half of all mortgages originated in the United States, depending upon market conditions and consumer trends.

18.    Fannie Mae purchases what are known as conventional conforming loans.  These are loans that are not insured or guaranteed by the federal government, are less than $417,000, and have certain prescribed risk characteristics.  Fannie Mae publishes its *Selling Guide* which outlines the specific requirements necessary for eligibility for Fannie Mae purchase.

19.     Fannie Mae buys these conventional conforming loans and either bundles them as securities and sells them to investors or holds the loans in its own portfolios.

20.     Unknown to the public, and due to its status as one of the two (2) dominant secondary market purchasers of mortgages, along with mortgage lenders' interest in assuring the sale of their loans, Fannie Mae has entered into contracts with numerous mortgage lenders and/or brokers throughout the United States which, in exchange for its advance commitment to buy mortgage loans from these lenders in the secondary market, allow it to dictate the underwriting terms and conditions of most of the conventional conforming loans that these lenders originate.

21.     For the mortgage lenders and brokers who have contracts with Fannie Mae and who sell mortgage loans to Fannie Mae in the secondary market, Fannie Mae requires that the mortgage applications be submitted through its *Desktop Underwriter* automated underwriting system ("DU System") in order to get a quick approval or denial, the best lender/broker pricing, higher debt-to-income ratios, higher loan-to-value ratios, better loan programs not available outside the DU System, and risk-based pricing, before any commitment is made to the prospective borrowers. For these lenders, Fannie Mae leases or licenses its DU System for use by the lenders or mortgage loan brokers, and charges these lenders or brokers a fee or does so on a cooperative non-profit basis for each mortgage application run through the DU System.

22.     Fannie Mae's DU System is also used in connection with non-conforming loans that Fannie Mae is not permitted to purchase pursuant to its congressional charter. These other types of loans include, but are not limited to FHA, Jumbo, and sub-prime loans.

23.     Through the DU System, Fannie Mae gathers data from an applicant's three-file and/or "tri-merge" consumer report from either a reseller of credit information or one or more of the three (3) major credit repositories, Equifax, Trans Union and Experian ("National Repositories), which Fannie Mae sells to the m o r t g a g e  lender or broker.

24.     And while a mortgage broker or lender may order a credit report from a reseller/tri-merge company or National Repositories during the application process as required

by the DU Guidelines, the DU System automatically uploads the raw credit data and other consumer credit information it gathers from the reseller/tri-merge company or National Repositories.

25.    Fannie Mae further mandates all resellers/tri-merge companies and/or National Repositories adhere to Fannie Mae's own confidential and proprietary guidelines for the methods of transmission, format and content of the raw credit data which is imported into its DU System.

26.    Fannie Mae's DU System then reviews, assesses and/or evaluates all of the information it obtains from the lender and/or broker derived from the borrower's loan application and the separate raw credit data uploaded from other consumer reporting agencies and/or resellers/tri-merge companies into the DU System, and generates its own report, known most frequently as the *Desktop Underwriting Findings* report ("DU Findings Report").

27.    The DU Findings Report is a detailed report documenting, among other things, the applicant's credit history, credit worthiness, credit standing,  credit capacity, character, general reputation, personal characteristics, mode of living, assets, income, debt-to-income ratio, and employment.  Further, the DU Findings Report contains findings, conclusions, comments and results reached by Fannie Mae concerning the applicant's credit and his or her "eligibility" for loan purchase by Fannie Mae, as well as Fannie Mae's recommendation as to whether the lender should grant or originate the loan, deny the loan or approve it subject to certain conditions being satisfied.  These DU Findings Report determinations are made for all types of loans submitted through the DU System, whether or not Fannie Mae purchases them in the secondary market.

28.    Despite the very important consumer report data included on DU Findings Reports, Fannie Mae's contracts with its mortgage lender clients and DU users prohibit lenders and/or brokers from disclosing its DU Findings Reports to the consumers who are the subject of the reports, and Fannie Mae intentionally enforces a policy of restricting disclosure of the DU Findings Reports to the very consumers to whom they pertain, in violation of the CCRAA and FCRA.

AMENDED CLASS ACTION COMPLAINT

**B.**   <u>Fannie Mae's Failure to Comply With The CCRAA Was Willful</u>

29.   Fannie Mae has acknowledged in its own internal documents that Fannie Mae is subject to the restrictions and obligations set forth in the FCRA, which mirrors the same restrictions and obligations as the CCRAA, when acting as a user of consumer reports, yet Fannie Mae knowingly and/or recklessly disregarded its additional separate obligation to maintain reasonable procedures under the CCRAA or FCRA to assure the maximum possible accuracy of foreclosure and short sale information in DU Finding Reports when it furnished them to lenders and/or brokers.

30.   At least by 2013, Fannie Mae's own internal documents acknowledge Fannie Mae read and understood that any one of seven FCRA statutory characteristics "trigger the FCRA" and went on to specify that such factors included "*any information* bearing on a 1) consumer's creditworthiness, 2) credit standing, 3) credit capacity, 4) character, 5) general reputation, 6) personal characteristics, or 7) mode of living." *See* 15 U.S.C. 1681a(d)(emphasis added). These very same seven characteristics specifically referenced in the CCRAA for the definition of a "consumer credit report." *See* CAL. CIV. CODE § 1785.3(c)(1).

31.   In the operation of its Desktop Underwriter system, Fannie Mae evaluates and analyzes raw credit data and makes a recommendation in the form of Fannie Mae's DU Findings Report that is furnished to subscribing lenders and/or brokers. Fannie Mae knows or has reason to know that its evaluation and analysis in the form of its recommendation conveyed through the DU Findings Report bears significantly on one or more of the foregoing seven factors.

32.   Fannie Mae knew or had reason to know that its conduct in the operation of its Desktop Underwriter System triggered the CCRAA obligation for it to maintain reasonable procedures designed to assure the maximum possible accuracy of the information it furnished to lenders and/or brokers. Nevertheless, Fannie Mae persisted in evaluating and analyzing raw credit data indicating the existence of a short sale and then falsely identifying that information as a "FORECLOSURE" in its DU Findings Reports - which Fannie Mae knew or should have known would significantly and adversely impact a consumer's eligibility to obtain mortgage financing.

33.    At least by 2013, Fannie Mae internally described and quoted the broad purpose of the FCRA set forth in the preamble to the companion federal statute.  It acknowledged the FCRA's purpose to be "*intended to ensure fair and accurate credit reporting*" in order to protect consumers "by requiring that *Consumer Reporting Agencies* ("CRAs") *adopt procedures to ensure* the confidentiality, *accuracy* and proper utilization of such information."  (Emphasis added).  Thus, Fannie Mae knew and/or had reason to know not only the national credit repositories (Equifax, Trans Union and Experian) had accuracy obligations under 15 U.S.C. § 1681e(b) of the FCRA, but a broader category of all consumer reporting agencies were covered under the FCRA and CCRAA and their dual mandate for accurate reporting.

34.    When Fannie Mae chose to disregard the accuracy of the information they were reporting, electing instead to identify and specifically use the term "FORECLOSURE" when the raw credit data indicated a short sale, came under fire, Fannie Mae, with the encouragement from and assistance of FHFA, made a concerted effort to shift blame away from Fannie Mae and on to one of the national credit repositories, mortgage servicers, resellers of tri-merge reports, coding adopted by the national credit associations, and even the lenders and/or brokers for failing to manually underwrite loans Fannie Mae knew they could not and/or would not do.

35.    Prior to the acts alleged herein, Fannie Mae failed to read the CCRAA as potentially requiring an entity, such as itself, that evaluates raw credit data and provides a recommendation to be used in considering the consumer's eligibility for a mortgage, to follow reasonable procedures to assure the maximum possible accuracy of the information it reported in its DU Findings Reports to third-parties.  Fannie Mae failed to read, or chose to ignore a reading, of the FCRA or CCRAA statutory language that its conduct as described herein falls squarely within the definition of a "consumer credit reporting agency" and "consumer report."

36.    Fannie Mae's utter failure to read the FCRA or CCRAA statutory language, or its choice not to so read the statute, that the DU Findings Reports are "consumer reports" and that Fannie Mae's activity in furnishing false information in DU Findings Reports to third-parties triggered the FCRA and CCRAA, was not reasonable.  If Fannie Mae ever made an express prior reading of the FCRA or CCRAA to reach any such conclusion, which Plaintiff does not

allege Fannie Mae first ever did, its reading was directly contrary to the broad scope of the FCRA or CCRAA and the same range of harms for which Congress enacted the FCRA to protect against more than forty years ago.

37.     Congress enacted the FCRA "*to ensure fair and accurate credit reporting, promote efficiency in the banking system*, and protect consumer privacy." *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (emphasis added).   To that same end, the California legislature embodied in the language of the statute its finding that "[t]here is a need to insure that consumer credit reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." CAL. CIV. CODE §§ 1785.1(c).

38.     Congress enacted the FCRA in recognition of the large impact a credit report can have on a person's life by affecting his access to both employment and credit, the importance of which was highlighted by long-standing case law prior to Fannie Mae's conduct here.  *See, e.g.*, *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153-54 (9th Cir. 2009); *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 981-82 (7th Cir. 2004); *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir. 2001).

39.     Additionally, prior to the DU Findings Reports that Fannie Mae furnished here, a host of Federal Trade Commission interpretations of the FCRA describing the broad application of the FCRA made it clear that those entities who procure and disseminate consumer reports to third parties – who do not even participate in the ultimate decision – are consumer reporting agencies subject to the FCRA. In particular, an employment agency that obtains information on job applicants and furnishes it to a prospective employer is a consumer reporting agency. *See* FTC Commentary on the FCRA, 16 C.F.R. Pt. 600 app. Sec 603(f)(4). Similarly, an entity that compiles claim payment information on prospective insureds and furnishes it to insurance companies for use in underwriting decisions is a consumer reporting agency.  *Id*. at 16 C.F.R. Pt. 600 app. Sec. 603(f)(5).   And private investigators who regularly obtain consumer reports and furnish them to their clients may be consumer reporting agencies. *Id.* at 16 C.F.R. Pt. 600 app. Sec. 603(f)(6); *see also 40 Years of Experience With the Fair Credit Reporting Act – An FTC Staff Report With Summary of Interpretations* (July 2011) at pp. 28-32 (emphasizing the

FCRA is intended to cover a very broad range of "assembling" or "evaluating" activities triggering that entities fall within the FCRA).

40.     Moreover, the FTC has repeatedly concluded that entities that provide consumer reports to clients or in response to a specific request are consumer reporting agencies. Specifically, the FTC has opined that an entity that provides employee screening services for client-employers (criminal history searches, Social Security number checks, education and employment verifications) is a consumer reporting agency. *See* FTC Informal Staff Opinion Letter: Haynes (June 9, 1998).   Similarly, the FTC concluded that, if a bank uses an "intermediary" entity to pull credit reports from the credit repositories and merge them into a single streamlined consumer report it provides to the bank, the intermediary is a consumer reporting agency. *See* FTC Informal Staff Opinion Letter: Kane (Oct. 27, 1997).

41.     The FTC also concluded that an entity that performs a similar function for automobile lenders as Fannie Mae does for mortgage lenders is a consumer reporting agency. *See* FTC Informal Staff Opinion: Grimes (June 9, 1993). The entity, Lendernet, received loan application information from automobile dealers, whereupon it obtained the applicant's credit report. It would then scan potential lender requirements and provide the dealer with a list of lenders. At the same time, it would provide application and credit information to lenders and provide them with a list of all dealer loan applications that meet Lendernet's criteria. The FTC opined that Lendernet was a consumer reporting agency as that term is broadly defined under the FCRA.

42.     Fannie Mae's utter disregard of the additional mandate of the CCRAA to assure the accuracy of information it furnished in its DU Findings Reports resulted in conduct that carried a substantially greater risk of harm than that associated with a merely careless interpretation of the CCRAA because Fannie Mae programed its DU System from the outset to have no ability to distinguish foreclosures from short sales - resulting in tens of thousands if not more rejections or refusals to process consumers' mortgage loan applications based on false information Fannie Mae furnished to lenders and/or brokers, effectively cutting out deserving consumers as participants in the mortgage marketplace as the struggling economy was trying to

rebound.

43.    In 2012 and early 2013, Fannie Mae became increasingly aware from complaints from borrowers, mortgage lenders/brokers, consumer reporting agencies, resellers, consumer reporting trade industry associations, the Consumer Financial Protection Bureau, and members of Congress that its DU System needed to be reprogrammed to fix its false reporting of foreclosures instead of short sales.  Fannie Mae, however, refused to do so.

**C.    The Downturn In The Economy Resulted In Many Homeowners Negotiating Short Sales Of Real Estate**

44.    Plaintiff Banneck, like all other class members herein, owned a piece of real estate that was subject to a mortgage lien.

45.    In 2007, the United States economy suffered a dramatic downturn.  The housing bubble burst, and there was a significant negative domino effect in the lending industry as well as the investment market.  Hordes of homeowners found themselves obligated on mortgages significantly greater than the values of their underlying homes.

46.    Short sales – a lender-approved sale of a home for less than the outstanding mortgage amount – emerged as a leading response to the growing crisis.

47.    By 2012, the Federal Housing Finance Agency ("FHFA") announced measures to make short sales easier for owners of underwater homes. The significant growth in approved short sales has helped buoy the housing market and push distressed house prices higher in the past few years.

48.    In February of 2010, Plaintiff Banneck, like all other class members herein, negotiated a short sale of his real estate satisfying both his first and second mortgage loans.

49.    Pursuant to Fannie Mae's published Desktop Underwriter Guidelines ("DU Guidelines"), Fannie Mae will not even consider purchasing a conventional mortgage loan if the applicant has had a short sale in the two (2) years prior to the current obligation.  In other words, Plaintiff Banneck, like all other class members herein, would not be able to qualify for conventional mortgage financing for a minimum of two (2) years following his short sale.

50.    Plaintiff Banneck, like all other class members herein, waited his obligatory two

(2) years before applying for a new conventional mortgage loan.

51.    Specifically, in or around April and May of 2013, Plaintiff sought to obtain a mortgage loan for himself through Red Rock Mortgage ("Red Rock") to purchase residential property in Las Vegas, Nevada.

52.    Plaintiff Banneck was denied conventional mortgage financing.

53.    For Plaintiff Banneck, like every class member herein, the basis for each denial was a DU Findings Report that contained a "Refer with Caution" recommendation, which amounts to a credit denial.

54.    For Plaintiff Banneck, like every class member herein, each "Refer with Caution" recommendation resulted from the fact that Fannie Mae inaccurately identified the previous short-sale as a "foreclosure," which automatically disqualifies the applicant for conventional mortgage financing for seven (7) years, rather than two (2).

55.    One or more of the DU Findings Reports Fannie Mae furnished to Red Rock pertaining to Plaintiff Banneck specifically stated as follows:

> Desktop Underwriter has identified a deed-in-lieu of foreclosure that was reported within the last two years, or a foreclosure that was reported within the last seven years.  This loan is ineligible for delivery to Fannie Mae.

56.    Plaintiff Banneck, like all other class members herein, suffered economic and/or non-economic harm as a result of this denial of his mortgage application.

**D.    DU Wrongly Flags Short Sales (And Any Serious Mortgage Delinquency) As A Foreclosure**

57.    On March 12, 2013, Fannie Mae released a "Desktop Underwriter Clarification" in response to mounting "requests for clarification on how Desktop Underwriter (DU) identifies a foreclosure and a pre-foreclosure sale[.]"  *See* Desktop Underwriter Clarification (a copy of which is attached hereto as Exhibit 1).

58.    In this regard, Fannie Mae described DU's identification of a pre-foreclosure or short sale as follows:

AMENDED CLASS ACTION COMPLAINT

| Borrower | Creditor | FC Type | Account Number | Date Report |
|----------|----------|---------|----------------|-------------|
| JAMES BANNECK | HSBC BANK | Foreclosure | ****1933 | 06/13 |

*See* Exhibit 1 at 1 of 3.

59.   Per the DU Findings Reports used to deny Plaintiff Banneck's mortgage application, like all other class members herein, Fannie Mae specifically and correctly identified the previous short sale.

60.   So long as the pre-foreclosure or short sale was completed more than two (2) years before the current application, that prospective loan is still eligible for purchase by Fannie Mae and the DU System will automatically not refer, i.e., deny, the application.  *See* Selling Guide, Part B, Subpart 3, Chapter 5 (relevant excerpts of the 2011 and 2013 versions of which are attached collectively hereto as Exhibit 2) at 433-434 and 464-465, respectively.  *See also* Exhibit 1 at page 2 of 7.

61.   In describing a DU Finding's Report identification of a foreclosure in the DU System, Fannie Mae represents as follows:

**Preforeclosure Sale Identification**

A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved.  At this time, there are no codes provided in the credit report data received by DU that specifically identify a preforeclosure sale.

With DU Version 8.2 in December 2010, DU began issuing a message based on the presence of Remarks Codes E0047 (Settlement accepted on this account), T0140 (Settled for less than full balance), or R0107 (Account legally paid in full for less than the full balance) on a mortgage or HELOC account.  However, because those codes can be used on any account for any reason, DU is not able to use those codes to identify a preforeclosure sale with 100% accuracy, so it is not able to fully automate the preforeclosure sale waiting period or eligibility requirements.

When DU issues the preforeclosure sale message the lender must confirm that the preforeclosure sale had been completed two or more years from the credit report date, and must confirm that the loan casefile complies with all other requirements specific to preforeclosure sales as specified in the Fannie Mae *Selling Guide*.

*See* Exhibit 1 at 1 of 3.

62.   Per this "Desktop Underwriter Clarification," Fannie Mae admits that accounts reported by the original creditor merely as "collection or charge-off" – accounts admittedly not in foreclosure – will be identified by the DU System as having been in foreclosure.

AMENDED CLASS ACTION COMPLAINT

63.     Any prospective loan that DU identifies as having a foreclosure in the previous seven (7) years will automatically be ineligible for purchase by Fannie Mae.  See Exhibit 2 at 464.

64.     Thus, for Plaintiff Banneck, like all other class members herein, even though a DU Findings Report correctly identified a previous short sale, acknowledging that so long as that short sale was more than two (2) years ago, the same DU Findings Report also manufactured a non-existent foreclosure and referred, i.e., denied, the application accordingly.

65.     This incorrect identification of a foreclosure prevented Plaintiff Banneck, like all other class members herein, from obtaining his conventional mortgage financing at the terms originally negotiated.

**E.     Fannie Mae Acknowledges Deficiencies In The DU System And DU Findings Reports**

66.     Upon information and belief, Plaintiff Banneck is only one of hundreds of thousands (if not greater numbers) of homeowners who have had a short sale misidentified by a DU Findings Report as a foreclosure, thereby preventing them from obtaining conventional financing or refinancing.

67.     In May 2013, the Consumer Protection Subcommittee of the U.S. Senate Committee on Commerce, Science & Transportation held a hearing on Capitol Hill to address a variety of problems plaguing the consumer reporting industry.

68.     During this hearing, Senator Bill Nelson, D-Fla., raised serious concerns about the significant and growing numbers of his constituents that had been denied conventional financing due DU Finding Reports wrongly identifying a foreclosure, in addition to, or instead of, a short sale.

69.     Legal counsel and staff for Senator Nelson informed Fannie Mae and FHFA in May of 2013 they believed Fannie Mae's falsely identifying an actual short sale as a foreclosure was a violation of the FCRA.

70.     After months of prodding from Senator Nelson, the federal Consumer Financial

Protection Bureau, the National Consumer Reporting Association and the National Association

of Realtors, Fannie Mae announced a change to its automated DU System to "fix" the problem:

**Foreclosure Identification**

When reviewing the credit report data received, DU reviews the manner of payment (MOP) codes and Remarks Codes associated with each tradeline, and the Public Record information to determine if a foreclosure has occurred.

Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as subject to a foreclosure if there is a current status code or MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline. If a foreclosure was reported within the seven-year period prior to the report date associated with the tradeline, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae as a DU loan.

*See* Desktop Originator/Desktop Underwriter Release Notes DU Version 9.1 dated August 20,

2013 (relevant excerpts of which are attached collectively hereto as Exhibit 3) at 6.

71.     While these changes were expected to take effect the week of November 16, 2013,

see Exhibit 3 at 1, and were intended to allow consumers to rightfully obtain conventional

financing from that point going forward, consumers continued to either be denied or would

foregoing seeking to apply for credit to obtain residential mortgage financing through Fannie

Mae's automated DU System because DU Findings Reports continued to inaccurately identify

short sales as foreclosures.

**F.  Fannie Mae Prohibits Disclosure of DU Findings Reports to Consumers**

72.     Fannie Mae had no mechanism to permit disclosure of DU Findings Reports or

for consumers to dispute inaccurate information appearing on them.

73.     In fact, Fannie Mae's standardized contracts with mortgages lenders and brokers

contain blanket prohibitions forbidding mortgage lenders from providing and/or disclosing

complete DU Findings Reports to consumers.

74.     The Fannie Mae Software Subscription Form/Agreement prohibits mortgage lender and brokers from making copies of DU Findings Reports, and prohibits them from distributing or allowing access of any component of them to "any person."

75.     Fannie Mae's Desktop Underwriter Schedule Non-Seller/Servicer (DU-Only) Terms and Conditions reiterates this prohibition:

4.     **Grant of Rights and Imposition of Obligations.**  For purposes of this Schedule, Subsection (b) of the Section captioned "Restrictions on Use" of the Master Terms is replaced with the following:

> Licensee shall only use the Licensed Materials for its own internal business purposes, as expressly authorized in this Agreement.  Without derogating from the generality of the foregoing, except as expressly authorized in this Agreement, (a) Licensee shall not use or allow others to use the Licensed Materials in a multiple-use arrangement (such as in conjunction with multi-lender web portals), or as a part of a service bureau, and (b) Licensee shall only use the Licensed Materials in support of its mortgage industry activities.  Licensee is specifically prohibited from distributing copies of the Documentation or any Fannie Mae Proprietary Information to Customers, except where the Documentation or Agreement otherwise expressly permits such distribution.

76.     The only information a mortgage lender or broker is permitted to provide to a consumer is Fannie Mae's recommendation and related underwriting finding, *not* any other contents of the DU Findings Reports, and only then upon the condition that the lender or broker misinforms the consumer about the impact or meaning of the DU Findings Reports, thus obfuscating their content.

77.     Mortgage lenders or brokers remain restricted from disclosing the full contents of DU Findings Reports, including copies thereof, even when adverse action is taken on the basis of the reports.

78.     After Mr. Banneck was denied mortgage financing, he requested that Red Rock Mortgage provide him with a complete copy of the DU Findings Report which formed the basis of the adverse action, and Red Rock Mortgage refused to provide the DU Findings Report.

79.     Plaintiff Banneck, like all other class members herein, suffered substantial economic and non-economic harm as a result of the false DU Findings Reports Fannie Mae issued through its DU System and Fannie Mae's prohibition on the disclosure of DU Findings Reports to consumers.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action on behalf of the following Classes:

(a) **The California Accuracy Class:** For Defendant's violation of section 1785.14(b) of the CCRAA:

All natural persons residing in the State of California who, within seven (7) years prior to the filing of this Complaint, were the subjects of a DU Findings Report furnished to a third party wherein Fannie Mae reported a "Refer with Caution" recommendation because Desktop Underwriter identified a foreclosure on a mortgage account(s) which also identified the account(s) as subject to a preforeclosure sale. Excluded from the class definition are any employees, officers, directors of Fannie Mae, any attorney appearing in this case, any consumer who has signed and delivered to Fannie Mae a general release of claims and any judge assigned to hear this action.

(b) **The California Dispute Accuracy Class:** For Defendant's violation of section 1785.14(b) of the CCRAA:

All natural persons residing in the State of California who, within seven (7) years prior to the filing of this Complaint, who (i) were the subjects of a DU Findings Reports furnished to a third party, (ii) the DU Findings report included a "Refer with Caution" recommendation, and (iii) Fannie Mae edited and/or removed information from the report as the result of a communication from a consumer or lender identifying inaccurate information in the report. Excluded from the class definition are any employees, officers, directors of Fannie Mae, any attorney appearing in this case, any consumer who has signed and delivered to Fannie Mae a general release of claims, and any judge assigned to hear this action.

(c) **The Nationwide Prohibition of Disclosure Class:** For Defendant's violations of section 1681e(c) of the FCRA:

All natural persons residing in the United States and its territories who, during the period beginning five (5) years prior to the filing of this Complaint and continuing through the date of the resolution of this case, Fannie Mae furnished a DU Findings Report to any third party which contained a "Refer with Caution" recommendation. Excluded from the class definition are any employees, officers, directors of Fannie Mae, any attorney appearing in this case, any consumer who has signed and delivered to Fannie Mae a general release of claims and any judge assigned to hear this action.

(d) **The California 1785.14(c) Prohibition of Disclosure Class:** For Defendant's violations of section 1785.14(c) of the CCRAA:

All persons residing in the State of California who, during the period beginning seven (7) years prior to the filing of this Complaint and continuing through the date of the resolution of this case, Fannie Mae furnished a DU Findings Report to any third party which contained a "Refer with Caution" recommendation. Excluded from the class definition are any employees, officers, directors of Fannie Mae, any attorney appearing in this case, any consumer who has signed and delivered to Fannie Mae a general release of claims and any judge assigned to hear this action.

81.    The Classes are so numerous that joinder of all members is impracticable.

Although the precise number of Class members is known only to Defendants, Plaintiff avers upon information and belief that the Classes number in the thousands.

82.   There are questions of law and fact common to the Classes that predominate over any questions affecting only individual Class members.   The principal questions concern whether the Defendants willfully and/or negligently violated the CCRAA and/or FCRA by failing to provide consumers with access to all information contained in their consumer files, by failing to follow reasonable procedures to assure the maximum possible accuracy of the information contained in consumers' files with respect to foreclosures and short sales and by prohibiting mortgage lenders from disclosing DU Reports to consumers.

83.   Plaintiff's claims are typical of the claims of the Classes, which all arise from the same operative facts and are based on the same legal theories.

84.   Plaintiff will fairly and adequately protect the interests of the Classes.   Plaintiff is committed to vigorously litigating this matter.   Further, Plaintiff has secured counsel who are very experienced in handling consumer class actions.   Neither Plaintiff nor his counsel has any interests which might cause them not to vigorously pursue these claims.

85.   This action should be maintained as a class action because the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing the Classes, as well as a risk of adjudications with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

86.   Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the CCRAA Classes.

87.   Whether Defendant violated the CCRAA and/or FCRA can be easily determined by Defendant's policies and a ministerial inspection of Defendant's business records.

88.   A class action is a superior method for the fair and efficient adjudication of this

controversy. Management of the Classes' claims is likely to present significantly fewer difficulties than those presented in many individual claims. The identities of the Class members may be derived from Defendant's records.

**CLAIMS**

**COUNT I – VIOLATION OF THE CCRAA § 1785.14(b)(Individual and Class)**

89.     Plaintiff incorporates all paragraphs as though the same were set forth at length herein.

90.     Pursuant to CAL. CIV. CODE § 1785.31, Defendant is liable for violating the CCRAA by failing to follow reasonable procedures to assure "maximum possible accuracy" of the reports it sold, in violation of CAL. CIV. CODE § 1785.14(b) with respect to Plaintiff and the California Accuracy Class by selling or furnishing on a cooperative non-profit basis a DU Findings Report that misidentified a short sale as a foreclosure and/or contained an inaccuracy that was disputed by the consumer to Fannie Mae.

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed California Accuracy Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the California Accuracy Class; that judgment be entered for Plaintiff and the Class against Defendant; that the Court award injunctive relief under the CCRAA prohibiting Fannie Mae from selling or furnish or furnishing DU Findings Reports to third parties until it implements reasonable procedures to assure the maximum possible accuracy of DU Findings Reports and come into full compliance with the CCRAA; that the Court award costs and reasonable attorney's fees under the CCRAA; and such other and further relief as may be necessary, just and proper.

**COUNT II – VIOLATION OF THE FCRA § 1681e(c) (Individual and Class)**

91.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

92.     Pursuant to 15 U.S.C. § 1681n and 1681o, with respect to Plaintiff and the Nationwide Prohibition of Disclosure Class, Fannie Mae is liable for violating section 15 U.S.C. § 1681e(c) the FCRA by prohibiting users of DU Findings Reports from disclosing such

reports to consumers, even when consumers are subject to adverse action based in whole or in part on the report.

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed Nationwide Prohibition of Disclosure Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Nationwide Prohibit of Disclosure Class; that judgment be entered for Plaintiff and the Nationwide Prohibition of Disclosure Class against Defendant for statutory damages of $100 to $1,000 per Class member per violation under the FCRA; that judgment be entered for Plaintiff and the Nationwide Prohibition of Disclosure Class against Defendant for actual damages under the FCRA; that judgment be entered for Plaintiff and the Nationwide Prohibition of Disclosure Class against Defendant for actual damages under the FCRA; that the Court award costs and reasonable attorney's fees under the FCRA; and such other and further relief as may be necessary, just and proper.

### COUNT III – VIOLATION OF THE CCRAA § 1785.14(c) (Individual and Class)

93.    Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

94.    Pursuant to CAL. CIV. CODE § 1785.31, with respect to Plaintiff and the California Prohibition of Disclosure Class, Fannie Mae is liable for violating section 1785.14(c) of the CCRAA by prohibiting users of DU Findings Reports from disclosing such reports to consumers, even when consumers are subject to adverse action based in whole or in part on the report.

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed California Prohibition of Disclosure Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the California Prohibition of Disclosure Class; that judgment be entered for Plaintiff and the California Prohibition of Disclosure Class against Defendant; that the Court award injunctive relief under the CCRAA prohibiting Fannie Mae from selling and/or furnishing DU Findings Reports to third parties until it removes any and all contractual language prohibiting the disclosure of DU Findings Reports

to consumers when the consumer is subject to adverse action based in whole or in part on the report, and requiring notification of this change to all lenders and users of such reports, as well as the consumers who were the subject of such reports; that the Court award costs and reasonable attorney's fees under the CCRAA; and such other and further relief as may be necessary, just and proper.

### COUNT IV – VIOLATION OF THE CCRAA § 1785.10.1 (Individual)

95.    Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

96.    Pursuant to CAL. CIV. CODE § 1785.31, Fannie Mae is liable for violating section 1785.10.1 of the CCRAA by prohibiting, dissuading, and/or attempting to dissuade, including through the use of contracts,  users of DU Findings Reports from providing Mr. Banneck with copies of such reports to him upon request,  even when the user had taken adverse action against him based in whole or in part on the report.

WHEREFORE, Plaintiff respectfully prays that judgment be entered for Plaintiff and that the Court award injunctive relief under the CCRAA as follows: Fannie Mae shall cease to sell or furnish on a cooperative non-profit basis DU Findings Reports to third parties unless and/or until removal of any and all contractual language prohibiting the disclosure of DU Findings Reports to consumers when the consumer is subject to adverse action based in whole or in part on the report, and notification of this change to all consumers and to all third parties to whom DU Findings Reports are provided; that the Court award costs and reasonable attorney's fees under the CCRAA; and such other and further relief as may be necessary, just and proper.

### JURY TRIAL DEMAND

97.    Plaintiff demands trial by jury on all issues.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, the Class, and/or the general public, prays for judgment against Defendant as follows:

- An order certifying this action as a class action under Rule 23 of the Federal Rules of

Civil Procedure as set forth herein;

- A temporary, preliminary and permanent order for injunctive relief enjoining Defendant from continuing the unlawful practices outlined of above and ordering Defendant take the action defined above;

- For a temporary, preliminary and permanent order for injunctive relief requiring Defendant to undertake an immediate public information campaign to inform members of the general public as to their prior practices and notifying the members of the proposed Classes of the potential for restitutionary relief;

- For an order requiring disgorgement and restitution of Defendant's ill-gotten gains and to pay restitution to Plaintiff, the Classes, and the general public all funds acquired by means of any practice declared by this Court to be unlawful, deceptive or unfair;

- For compensatory, special and general damages according to proof and as the Court deems just and proper;

- Assuming certification of the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, for distribution of any moneys recovered on behalf of the general public, or the Classes, via fluid recovery or *cy pres* recovery where necessary to prevent Defendant from retaining any of the profits or benefits of their wrongful conduct;

- Imposition of a constructive trust, an Order granting recessionary and injunctive relief and/or such other equitable relief, including restitution, disgorgement of ill-gotten profits and an order requiring Defendants to provide corrective notice to Class Members as set forth herein and as the Court deems just and proper;

- An appropriate claims resolution facility to administer the relief in this case;

- For reasonable attorneys' fees and costs of investigation and litigation under, among the statutes set forth herein, or the common fund doctrine;

- For costs of lawsuit, pre-judgment, and post-judgment interest; and

- Such other and further relief as the Court may deem necessary or appropriate.

Dated March 12, 2018

/s/ Stephanie R. Tatar
Stephanie R. Tatar, Esq. (SBN: 237792)
TATAR LAW FIRM, APC
3500 West Olive Ave., Suite 300
Burbank, CA 91505
Tel: (323) 744-1146
Fax: (888) 778-5695
E-mail: Stephanie@thetatarlawfirm.com

Paul B. Mengedoth, Esq. (*Pro Hac Vice*)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail:  paul@mengedothlaw.com

AMENDED CLASS ACTION COMPLAINT

Sylvia A. Goldsmith, Esq.*
**GOLDSMITH & ASSOCIATES, LLC**
20545 Center Ridge Road, Suite 120
Rocky River, OH 44116
Tel: (440) 934-3025
E-mail: goldsmith@goldsmithlawyers.com

James A. Francis, Esq. (*Pro Hac Vice*)
John Soumilas, Esq. (*Pro Hac Vice*)
Lauren KW Brennan, Esq. (*Pro Hac Vice*)
**FRANCIS & MAILMAN, P.C.**
Land Title Building, Suite 1902
100 South Broad Street
Philadelphia, PA 19110
Tel:  (215) 735-8600
E-mail:jfrancis@consumerlawfirm.com
E-mail:  jsoumilas@consumerlawfirm.com

Kristi Cahoon Kelly, Esq.*
Andrew Guzzo, Esq.*
**KELLY & CRANDALL PLC**
3925 Chain Bridge Road, Suite. 202
Fairfax, VA 22030
Tel: (703) 424-7570
E-mail: kkelly@kellyandcrandall.com
E-mail: aguzzo@kellyandcrandall.com

***Attorneys for Plaintiff***

*\*Pro Hac Vice application to be submitted*

AMENDED CLASS ACTION COMPLAINT